Neil A GOLDWASSER, Doing Business
as Century Offset Company

v.

The UNITED STATES.

No. 477–61.

United States Court of Claims.

Dec. 13, 1963.

Jones, Chief Judge, and Davis, J.,
dissented in part.

Jack Rephan, Washington, D. C., for
plaintiff. Solomon Dimond, Washington,
D. C., was on the brief.

Jay J. Levit, Richmond, Va., with
whom was Asst. Atty. Gen. John W.
Douglas, for defendant.

Before JONES, Chief Judge, and
WHITAKER, LARAMORE, DURFEE
and DAVIS, Judges.

WHITAKER, Judge.

This is an action for breach of con-
tract. Both parties have moved for sum-
mary judgment.

On July 18, 1960, plaintiff was awarded
a Department of the Navy contract to
print and deliver a weekly newspaper
called the Shipworker at New York Naval
Shipyard. The contract was to run from
August 1, 1960 to June 30, 1961. The es-
timated total contract price was $40,000.

After plaintiff had printed the editions of the Shipworker from August 5, 1960 to October 21, 1960, he was orally advised that no further issues would be ordered from him. Plaintiff was thereafter given no more printing under the contract, and the remaining numbers of the Shipworker were printed by another printer.

Plaintiff claims that this was a requirements contract and that each failure on defendant's part to order its weekly requirements for the printing of the newspaper from him was a breach of contract. Defendant denies that this was a requirements contract; it says that after it had paid for delivery of the first edition of the newspaper at a price exceeding $100.00, it was free to give its printing business to whomever it chose. In support of its position, defendant points to the "Indefinite Quantities" clause of the Invitation for Bids:

> "INDEFINITE QUANTITIES
>
> "The total quantities specified herein are estimates only. The amounts which the Contractor may be required to furnish and the Government to accept hereunder shall be the amounts which shall from time to time be ordered hereunder by the Government during the ordering period of this contract. In any event, however, the Government shall order supplies (or services) hereunder having an aggregate value at the unit prices specified herein of not less than $100.00; and the Government shall be entitled to order and the Contractor shall be required to furnish supplies (or services) hereunder amounting to not more than the total estimated quantities set forth herein."

Plaintiff replies that the following excerpts from the Invitation and the Specifications show that a requirements contract was intended:

> "SERVICES (Labor and Material) including paper stock as specified below and print weekly issues of the New York Naval Shipyard publication Shipworker as follows:
>
> 1. PRICE SCHEDULE A (Print in black ink)
>
> To set type, proofread, make up, submit galley proofs and page proofs, and print in one color ink, fold, insert, and deliver: 50 Issues (about 750,000 copies)
>
>   *   *   *   *   *   *
>
> "Minimum numbers of copies to be printed under this contract shall be 10,000 per issue, with the New York Naval Shipyard reserving the right to add increments of 1,000 up to a total of 30,000 copies per issue. The present requirement will be 15,000 copies per issue. Printing is to be in black ink unless otherwise directed. During the 12 month term to this contract, [sic] it is expected that one to two issues will be printed in two colors. A six or eight page issue may be requested on occasion."

The two above-quoted clauses are directly contradictory; one or the other must fall. We think the indefinite-quantities clause must fall.

In the first place, it is a verbatim copy of a form used in many Government contracts. On the other hand, the clause on which plaintiff relies relates to this specific contract and to it only. The specific provision must prevail over the general.

The Government's draftsman picked up the wrong form. It is entirely inappropriate to what the parties sought to accomplish. The specific provision called for the printing of a minimum of 10,000 copies per issue for 50 issues. The contract was to last for 12 months, and the estimated contract price was $40,000. In contrast, the indefinite-quantities clause only bound the Government to take "supplies (or services)"[1] up to $100.00.

According to the Government's contention, when it paid for $100 worth of printing, its obligation was discharged. But, on the other hand, it acknowledges

---

1. The form applied where supplies were contracted for or services were to be supplied.

that the contractor was bound to keep his facilities available to print 10,000 copies a week of the newspaper whenever the Government might elect to order them. This would have prevented him from accepting any other business requiring the need of these facilities. It would have been a one-sided bargain, bordering upon a lack of mutuality under the facts of this case. The contract should not be given this construction if it can be avoided.

Defendant's purpose was to employ a printer to print its weekly newspaper over a 50-week period in quantity sufficient to provide each employee of the Shipyard with a copy. That is why the contract provided for a fixed minimum quantity for each issue, but gave the contracting officer authority to order increments in units of 1,000 copies. The long term of the contract and the large contract price are also the reasons why the defendant required plaintiff to obtain a Certificate of Competency from the Small Business Administration before it would make the award to him. If it were able to shut plaintiff off after purchasing $100 worth of printing, defendant would not have gone to the trouble of assuring itself of his competency to perform the contract over its entire term. All signs indicate that both parties envisaged a relatively long-term relationship between them; nothing in the facts supports the idea that they intended that relationship to subsist only occasionally and at defendant's election.

In Tennessee Soap Co. v. United States, 126 F.Supp. 439, 130 Ct.Cl. 154 (1954), cited by defendant in support of its interpretation, there were no contradictory provisions in the contract, and the commercial setting was such that an indefinite-quantities contract made sense. In that case, it was clear at the time the contract was made that the Navy's need for soap was uncertain; though it obviously would need some soap over the course of the contract, the Navy had no idea just how much it would need or when it would want delivery to be made. In such a situation, the indefinite-quan-

tities clause fits the situation; it enables the Government to procure needed supplies but does not commit it to buy too much or at the wrong time. In the case at bar, however, the minimum quantity of the Shipworker that would be needed and the times of its delivery were known to defendant in advance. Since the contractor was obligated to furnish this minimum number, the Navy, on the other hand, must be held to have been obligated to accept this minimum number.

Since this is a contract which required the Government to purchase its needs from plaintiff, it had no right to purchase them from another printer as long as the contract subsisted.

This is the view which the Armed Services Board of Contract Appeals took when plaintiff appealed the case to it. But the Board concluded that, although the refusal of the defendant to order from the plaintiff was unjustified, the effect of defendant's refusal was to terminate the contract for its own convenience under the Termination-for-Convenience-of-the-Government clause. Defendant urges us to accept this view and to remit plaintiff to his remedy under the termination procedure.

We are, however, unable to agree with the suggestion that there was in fact a termination for the convenience of the Government. At no time during the contract period did the contracting officer formally advise the contractor that the Government was terminating the contract for its convenience. The letter of the Commanding Officer of the Yard of October 4, 1960 (defendant's exhibit 2) said, "we are compelled to take steps to cancel our current contract with you for the printing of the Shipworker," but these steps were never taken.

The Armed Services Procurement Regulations (32 C.F.R. § 8.701) prescribe a mandatory termination-for-convenience clause which states that the contracting officer must, when terminating the contract for the Government's convenience, provide the contractor with a formal Notice of Termination and the manner in

which the contractor can submit its termination claim, and sections 8.800–8.801 provide for form letters to be used to give Notice of Termination. None of this was done.

██ In the light of our recent decision in G. L. Christian & Associates v. United States, Ct.Cl., 312 F.2d 418 (1963), the Armed Services Procurement Regulations have the force of law. These regulations were not complied with.

Indeed, the contracting officer never had any intention of cancelling the contract for the convenience of the Government, thereby subjecting the Government to liability; but rather because it asserted plaintiff's workmanship was faulty and not up to the standard required by the contract. On October 4, 1960, Rear Admiral S. N. Pyne, Commander of the New York Naval Shipyard, wrote to plaintiff complaining that the numbers of the newspaper that had theretofore been printed "have been reproduced in an unacceptable quality and appearance." The letter added that the poor quality of plaintiff's work had drawn complaints from the readers, and that in spite of plaintiff's promises to improve the quality of the printing, "Thus far whatever measures you have taken to eliminate these faults have been unsuccessful." The letter concluded:

> "For these reasons, and after nearly two months of continued substandard quality and complaints from our readers you did not correct the faults indicated to you. We can therefore no longer jeopardize the standing and readership of the Shipworker. Consequently we are compelled to take steps to cancel our current contract with you for the printing of the Shipworker."

Thereafter, the editor of the Shipworker gave plaintiff oral notice that he would not be allowed to print the October 28 issue, but he did not state the reasons therefor.

At no time prior to the Board of Contract Appeals' decision did any representative of defendant take the position that the contract was terminated for the convenience of the Government. Until then its position had been that under the indefinite-quantities clause its obligation was limited to ordering $100 worth of printing.

The defendant's contention would retroactively give a different legal effect to what was originally intended "by changing the label which had been expressly and purposely attached to it when the termination occurred." Klein v. United States, 152 Ct.Cl. 8, 20, 285 F.2d 778, 784–785 (1961). This we cannot do since " * * * [i]t would be anomalous indeed if the Government were entitled to breach its contract at will, and then escape the penalty for its breach by retroactively invoking a termination for convenience." Id. 152 Ct.Cl. at 18, 285 F.2d at 783. Cf. Line Construction Co. v. United States, 109 Ct.Cl. 154, 190 (1947).

It seems clear to us that the sole ground upon which printing orders were withdrawn from plaintiff was that he had defaulted upon his obligation to print a newspaper of good quality and workmanship. If plaintiff had so defaulted he had breached the contract and it might have been formally terminated for plaintiff's default. In such case defendant would be justified in refusing to order the printing of any further issues from plaintiff and he would be entitled to no damages. If, on the other hand, plaintiff's work was of an acceptable quality, he was not in default and would be entitled to his damages and not merely a convenience-termination settlement.

██ This is, therefore, a breach of contract case, and the sole question is which party caused the breach. The Board of Contract Appeals made a finding to the effect that the Government was not justified in cancelling the contract on the ground of poor workmanship. Since this is a breach of contract case, the findings of the Board on this point are neither conclusive nor binding on this court, but one to be determined, in the first instance, by a commissioner of our court.

Accordingly, both defendant's motion and plaintiff's cross-motion for summary judgment are denied, and the case is remanded to a commissioner for further proceedings.

JONES, Chief Judge (dissenting in part):

I agree with the first part of the majority opinion that this was a requirements contract, subject to defendant's prescribed right of termination under either of the two provisions in the contract which conferred that right. Each of these provisions gives the defendant the specific right to terminate.

The first of these provisions is in part as follows:

"22. TERMINATION FOR CONVENIENCE OF THE GOVERNMENT

"(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination * * *."

The second provision authorizing termination is set out in Article 11, which is in part as follows:

"(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure."

Paragraph (c) excuses the contractor for failure to perform for unforeseeable causes such as fires, floods, acts of God, etc.

After some other provisions, paragraph (e) of Article 11 is as follows:

"(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor or subcontractor pursuant to the provisions of paragraph (c) of this clause, such notice of default shall be deemed to have been issued pursuant to the clause of this contract entitled "Termination for Convenience of the Government," and the rights and obligations of the parties hereto shall in such event be governed by such clause. *(Except as otherwise provided in this contract, this paragraph (e) applies only if this contract contains such clause.)*"

These, then, are the only two provisions in the contract which give the defendant the right of terminating the contract.

The majority opinion takes the position that no notice of termination for convenience of the Government was given. Here we part company. There is no question that notice of cancellation was given. That right could only be exercised under one or both of the two listed articles.

In the letter of October 4, 1960, after making some complaint of the quality and appearance of the work, the letter ended with these words, "consequently we are compelled to take steps to cancel our contract with you for printing of the

Shipworker." This was followed with a later oral statement that the contract would be cancelled and further information to the effect that the contract for the printing of the next issue would be let to a different contractor was conveyed to plaintiff. When the quoted provisions of the two letters in the record are given their natural interpretation, it becomes clear that they constituted notice that the defendant was exercising its privilege of terminating the contract under one or the other article of the contract which gave the defendant the privilege of termination. I have not the slightest doubt that both parties so understood it. This is especially true when the letters and oral notice were followed by defendant letting additional work to other parties. Plaintiff admits knowledge of this action.

No doubt in many instances termination is based on the fact that the defendant may not be pleased with the work of the contractor. It may terminate a contract for convenience of the Government with or without assigning a definite reason for doing so. It may terminate under Article 11 for any of the listed reasons. In the event the latter termination was unjustified, the defendant must account to the plaintiff on the same basis as if the termination had been under Article 22.

The majority concludes that because the notice was for cancellation rather than termination, proper notice of termination was not given. This we are persuaded to believe is a strained construction. According to both legal and standard dictionaries, one of the meanings of "cancellation" is "to terminate or end." Also, one of the meanings of "terminate" is "to end, cancel or stop." Thus, the fact that the word "cancel", rather than the word "terminate" was used is simply a play on words and a distinction without substantial difference. There may be a breach of the contract without cancellation or termination, e. g., a failure to comply with the terms of the contract, the interference by one party with the operations under the con-

tract, unreasonable delays, and various other reasons. A cancellation may also constitute a breach.

On the other hand, cancellation necessarily means a termination. The two words are almost interchangeable. And yet because, forsooth, the word "cancellation" was used rather than "termination", the majority has undertaken to read out of the contract the reserved rights stipulated in the contract. Such a position will stand neither the light of reason nor the logic of analysis.

One article authorized termination simply when in the judgment of the contracting officer it was for the best interests of the Government. No specific reason was required. The other article provides for cancellation for either of two specific reasons, one of which includes the assigned reason given in the letter from the defendant to the plaintiff, dated October 4, 1960. Item 3, page 8 of the contract specifications states that the work "shall be of the best commercial quality and workmanship." Article 11 (*e*) states that if after the contract is terminated under paragraph (*a*) it is determined that the failure to perform is due to causes beyond the control or negligence of the contractor such default shall be deemed to have been issued pursuant to the clause entitled "Termination for Convenience of the Government", and the rights and obligations of the parties hereto shall in such event be governed by the termination clause if the contract contains such a clause.

The Board of Contract Appeals reached the conclusion that this act of cancellation should be treated as a termination for the convenience of the Government. We quote from the Board's opinion:

"Thus we hold that when the Government without appropriate reasons stopped calling on [plaintiff] for the publication of the "Shipworker" and procured the services from other sources, it thereby effectively terminated the subject contract for its own convenience. The rights and obligations of the parties under these circumstances should now be

determined pursuant to the 'Termination for Convenience of the Government' article."

In College Point Boat Co. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L. Ed. 490 (1925), the Supreme Court, through Mr. Justice Brandeis, stated in effect that the Government had an unconditional right to cancel the contract in suit even though the Government itself had clearly breached the contract and notwithstanding the plaintiff was already in that Court suing the Government for the breach. We quote from that opinion 207 U.S. at pages 15 and 16, 45 S.Ct. at pages 200–201, 69 L.Ed. 490 the following:

"The question remains whether the measure of damages recoverable for this breach is the same as it would have been if the Government had not possessed the right of cancellation. A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.[2] An un-

"2. Carpenter Steel Co. v. Norcross [6 Cir.], 204 Fed. 537, 539–540; Farmer v. First Trust Co. [7 Cir.], 246 Fed. 671, 673 [L.R.A.1918C, 1027]; E. H. Taylor, Jr., & Sons v. Julius Levin Co. [8 Cir.], 274 Fed. 275, 282; Lubriko Co. v. Wyman [3 Cir.], 290 Fed. 12, 15; Boston Deep Sea Fishing & Ice Co. v. Ansell, L.R. 39 Ch.Div. 339, 352; In re London & Mediterranean Bank, Wright's Case, L.R. 7 Ch.App. 55; Baillie v. Kell, 4 Bing, N.C. 638, 650.[3]

conditional right to cancel can be availed of for the purpose of terminating a contract, even after suit brought unless some intervening change in the position of the other party renders that course inequita-

ble. * * * Ignorance of its right doubtless prevented the Navy Department from taking, shortly after the Armistice, the course which would have resulted legally in cancelling the contract at that time. But the right to cancel was not lost by mere delay in exercising it; among other reasons, because the statute conferred upon the Government also the power to suspend the contract. The right remained effective as a limitation upon the Corporation's right to have the Government accept and pay for the mats. This continuing right of cancellation, which was asserted later, in court, operated to curtail the damages recoverable. It limited the value of the plaintiff's right to require performance, and hence the amount and character of the loss for which compensation must be made. Prospective profits were not recoverable."

It is true that the cancellation in the College Point Boat Co. case was permitted by a special statute then in force which covered the right to modify, suspend, or cancel a contract for the building, production, or purchase of ships or materials. However, in this particular case two provisions in the contract freely signed by both parties gave practically the same rights and are just as binding on the parties as was the statute involved in the College Point Boat Co. case.

In a similar case of Russell Motor Car Company v. United States, 261 U.S. 514, at page 523, 43 S.Ct. 428, at page 431, 67 L.Ed. 778 (1923), based on the statute, the Supreme Court stated:

"In cancelling the contract it was not necessary that the statute should be expressly referred to."

And on page 524 of 261 U.S., on page 431 of 43 S.Ct., 67 L.Ed. 778.

"The contract, we must assume, was entered into with the prospect of its

3. I quote the following from Farmer v. First Trust Co., supra, "Even if the cause assigned for dismissal was not in itself sufficient, if it appears that sufficient cause therefor did in fact exist, the dismissal was justified."

cancellation in view, since the statute was binding and must be read into the contract. The possible loss of profits, therefore, must be regarded as within the contemplation of the parties. The lower court was right in refusing to allow anticipated profits and, there being nothing in the findings to justify the contrary, we must accept the amount fixed on the basis of just compensation as adequate."

It will be noted that the opinion states in effect that the statute then in effect became a part of the contract the same as if the provision had been written in the contract.

The case of Klein v. United States, 152 Ct.Cl. 8, 285 F.2d 778 (1961), involved a number of different issues, including the False Claims Act, fraud and other issues, and is clearly distinguishable on the facts from the case at bar.

I agree with the Board that when the contract and the various letters with respect to its operation and suspension are considered together this should be treated as a termination for the convenience of the Government and that settlement should be had on the basis of the termination provisions of the contract.

The two provisions in the contract which give the right to terminate or cancel the contract should not be pitched out of the window merely on a choice of words and a distinction that for all practical purposes does not exist. Both parties knew exactly what was going on, both parties clearly understood the situation, both parties knew the contract was being ended, both parties knew the two provisions for termination, cancellation, or ending of the contract were in the instrument which they had signed and the only ones contained in the contract instrument which gave any authority for cancelling of the contract.

These are important provisions. In a government that is farflung in its operations, with a vast number of employees, when that government must frequently struggle with the problem of insufficient available funds, where there is always the possibility of a change of policy or a slacking of need for the supplies in question, restrictive provisions are vital.

In a straight breach of contract suit the defendant might be saddled with a large judgment or with none at all, depending on the facts that may develop. The defendant rather than take this chance specially asked that this matter be treated as a termination under the terms of the contract. In all the circumstances and factual developments of this case I do not think the defendant should be denied its contractual right that the damages be thus restricted.

Apparently neither the contracting officer nor anyone representing him has made a determination of the amount, if any, due the plaintiff under the termination clause. So far as the record is concerned, no apparent effort was made by the contracting officer and the contractor to agree on this amount and the contracting officer did not determine the amount which should be paid to the plaintiff under the termination clause.

I would suspend action in this case for 30 days with a proviso that if the plaintiff or defendant desires to have this case referred back to the Board or to the contracting officer for the purpose of having this amount determined, either party may file such a motion during the interim period and it should be granted. If no motion were made during the specified time, I would refer the matter to one of the commissioners of this court for the purpose of hearing and determining the issue.

DAVIS, Judge (dissenting in part).

I stand with the court on two propositions: (a) this was a requirements contract, not an "indefinite quantities" contract; and (b) Klein v. United States, 152 Ct.Cl. 8, 285 F.2d 778 (1961), requires us to hold that, if plaintiff's contract was wrongfully terminated for default, it cannot now be considered as having been terminated for the defendant's convenience. I depart from the

**730**

court in believing that this contract was *not* terminated for default and that no issue of default is presented. The defendant does not argue that plaintiff was in default or that the contract was terminated under the default article. In cancelling the agreement, the contracting officer did not mention that clause; the references in Admiral Pyne's letter of October 4, 1960, to plaintiff's standard of work seem to me no more than an explanation of the reason why the defendant was exercising the privilege it thought it had of refusing to deal with plaintiff at any time and for any reason. The truth, to my mind, is that defendant's officials erroneously considered this an "indefinite qualities" contract and proceeded on that basis. They mistakenly thought the United States would incur no liability of any kind, no matter what the state of plaintiff's performance.

In the absence of a convenience-termination article, the defendant's abrupt cancellation when it still needed the printing would have been a breach entitling plaintiff to the full common-law measure of damages. The termination article, however, sets the limit to the possible recovery and precludes prospective profits. As the Chief Judge points out, the failure of the defendant to invoke that article makes no difference. This was not a termination for default and the rule of the Klein case is inapplicable. See John Reiner & Company v. United States, Ct. Cl., 325 F.2d 438 and Brown & Son Electric Company v. United States, Ct. Cl., 325 F.2d 446.[4] It follows, in my view, that the measure of plaintiff's damages is what he would have received if there had been a convenience-termination.

4. In the course of showing that the defendant never invoked the termination-for-convenience article, the court points out that the contracting officer did not send a termination notice or follow the regulatory procedures for such a termination. Those facts are entirely relevant to deciding whether the default-termination *or* the convenience-termination mechanism was triggered by this contracting officer. The court decides, on the basis of these and other circumstances, that the default article was used in this instance and decides the case on that foundation. The failure to invoke the convenience-termination article and procedures would not matter, however, if the contract were cancelled, not for default, but because the defendant erroneously believed the agreement to be an "indefinite quantities" contract. See John Reiner & Company v. United States and Brown & Son Electric Company v. United States, supra.