**E. H. SALES, INC.**

v.

**The UNITED STATES.**

**No. 75–61.**

United States Court of Claims.

Jan. 22, 1965.

F. Hamilton Seeley, Washington, D. C., for plaintiff. Thomas F. Shannon and R. Dobie Langenkamp, Washington, D. C., were on the brief.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. David V. Anthony, Washington, D. C., was on the brief.

Before COWEN, Chief Judge, DURFEE, DAVIS, and COLLINS, Judges, and WHITAKER, Senior Judge.

WHITAKER, Senior Judge.

This is a suit by plaintiff seeking an equitable adjustment under the "Changes" article of the contract. It is not a suit for breach of contract; it is a suit on the contract to recover an amount alleged to be due thereunder. In plaintiff's motion for summary judgment, it says it "seeks an equitable adjustment in the per unit price of repair contract because of the Government's failure to deliver approximately 79% of the material promised. Whereas the contract clearly stated that 183 business machines listed by purpose, size and manufacturer were 'to be furnished' only 38 machines were delivered. This failure to meet the Government-furnished property commitment drastically raised the Plaintiff's per unit costs and necessitates the making of an 'equitable adjustment' under the terms of the 'Changes' clause."

Defendant also makes a motion for summary judgment on the ground that this was an indefinite-quantities contract limiting the amount which the Government was required to spend on the rehabilitation of the machines to $100. We do not think the Government's motion for summary judgment can be sustained.

The original contract was entered into on September 2, 1955, to run from that date through June 30, 1956. It called for the dismantling and either reassembling or repair of 183 pieces of machinery which were specifically described. It called for 153 presses, each of which was specifically identified as follows:

| | | |
|---|---|---|
| 99 | Multilith Machines | 10″ x 15″ |
| 3 | Multilith Machines | 14″ x 20″ |
| 13 | Webendorfers | 14″ x 20″ |
| 23 | Webendorfers | 17″ x 22″ |
| 8 | Harris | 17″ x 22″ |
| 3 | Webendorfers | 22″ x 29″ |
| 4 | Harris | 22″ x 34″ |

It also called for 30 folders, specifically identified as follows:

| | | |
|---|---|---|
| 1 | Multilith | 12″ x 19″ |
| 1 | Davidson | 14″ x 20″ |
| 1 | Liberty | 14″ x 20″ |
| 4 | Dexters | 14″ x 22″ |
| 6 | Baum | 17″ x 22″ |
| 2 | Baum | 18″ x 25″ |
| 2 | Dexters | 18″ x 25″ |
| 13 | Baum | 22″ x 28″ |

After the contractor had dismantled and inspected the machines turned over to it, it was to report to the contracting officer its estimate of the cost of repairing each of them, whereupon the contracting officer was required to issue a task order either calling for the repair of the article or for reassembling it.

Only a few machines were delivered to the contractor between the 2d of September, 1955, and January 16, 1956, possibly for the reason that the Government thought that there ought to be a limitation upon the amount that could be spent for labor in the dismantling and reassembling of the machines, and because it thought that the contract ought to be otherwise modified. It was modified on January 16, 1956. The revision eliminated the above-referred to provisions of the original contract, and there were substituted, among others, Sections A and B, the latter of which contained the clause upon which the Government relies, limiting its obligation to furnishing

materials amounting to not less than $100.

Section A of the revised contract sets out precisely the same items as were listed in the original contract. This section is headed "SERVICES AND MATERIALS TO BE FURNISHED." Paragraph 1 thereof reads: "Services, facilities, material and parts necessary for the overhaul and repair of those of the equipments listed below designated by the Contracting Officer in a work order under this contract." Then follow the same items listed in the original contract. Paragraph 2 of Section A reads: "Services, facilities, material and parts necessary for the dismantling and reassembling of those of the equipments listed above of which the cost of repair is deemed excessive."

The substance of this section, therefore, is that the Government promises to furnish to the contractor the machines listed. The contractor on his part is to dismantle the machines and repair those which the contracting officer thinks it economical to repair and to reassemble the rest. This section is typewritten, as is also Section B, which contains the sentence upon which the Government relies. Section B reads:

"SECTION B. SCOPE, ESTIMATED COST AND TERM OF CONTRACT

"1. Scope. The equipments listed above are in need of repair and overhaul. The purpose of this contract is to ascertain which of the above equipments it is economically feasible to overhaul and to overhaul those machines.

"Total Estimated Cost and Estimated Fixed Fees .. $50,000.00

"The above amount is an estimate only. The amount of materials and services which the contractor may be required to furnish and the Government to accept hereunder shall be the amounts which shall be specified by work orders issued hereunder by the Government during the ordering period of the contract. In any event, however, the Government shall order materials and services amounting to not less than $100.00, and the Government shall be entitled to order and the contractor shall be required to furnish materials and services amounting to not more than the total of the estimated cost and the estimated fixed fees set forth above."

 The Government has paid plaintiff more than $100 for work done on machines furnished, which, the Government says, is the extent of its obligation. We are clearly of the opinion that this position is untenable. Whereas the Government, had only to deliver machines the repair of which would cost $100, the plaintiff was obliged to keep available facilities for the dismantling and reassembling and repairing of machines at a cost of $50,000, which later was increased to $125,000. As we said in Neil A. Goldwasser, d. b. a. Century Offset Company v. United States, Ct.Cl., 325 F.2d 722, decided December 13, 1963, this "would have been a one-sided bargain, bordering upon a lack of mutuality under the facts of this case. The contract should not be given this construction if it can be avoided."

 Moreover, the $100 limitation provision is in direct conflict with the provisions of Section A. The caption of Section A is "SERVICES AND MATERIALS TO BE FURNISHED." Under this heading there are listed the machines the Government says it will furnish to the contractor, describing each particular machine in detail. Some of the machines to be furnished were to be overhauled and repaired, as provided for in Section A, paragraph 1. The others, the cost of the repair of which was deemed excessive, were to be merely dismantled and reassembled, but this section contains a definite representation that the Government will deliver, for one purpose or another, all of the machines listed.

The first paragraph of Section B is in harmony with Section A. It reads:

"1. Scope. The equipments listed above are in need of repair and over-

haul. The purpose of this contract is to ascertain which of the above equipments it is economically feasible to overhaul and to overhaul those machines.

"Total Estimated Cost and Estimated Fixed Fees. .$50,000.00"

Then comes this completely inconsistent paragraph upon which the Government relies, a paragraph which obligates the Government to deliver to the plaintiff not more than $100 worth of work, although the preceding paragraph recited that the estimated cost of the work to be done on the machines to be furnished was $50,000, which was later increased to $125,000.

■ This $100 limitation provision is applicable and entirely proper in a contract where the Government does not know what its requirements will be, but it clearly has no place in a contract calling for the furnishing of specifically described items.

The Government, of course, drew the contract. Why its representative happened to pick up this completely inapplicable standard clause and put it into this contract, we do not know. We do not know whether it was inadvertent or not. The plaintiff apparently overlooked it. When the revision of the contract was under discussion, this paragraph was not mentioned. Plaintiff's attention was not drawn to it until after this contract had expired by its own terms and a new contract had been entered into.

Because this paragraph is so completely contrary to the manifest intention of the parties, we think it must be disregarded.

That the Government obligated itself to deliver specific machines and not an indefinite number of them is further shown by the fact that, when the Government decided it wanted additional machines dismantled and either reassembled or repaired, it amended the contract by describing the new machines particularly by brand name, type, size, and quantity. Had the Government understood that its obligation had been fully discharged

when it delivered to the plaintiff $100 worth of work, it, of course, would not have gone to the trouble of amending the contract to call for work to be done on additional machines.

Just as in the Goldwasser case, supra, we think the contract should not be given the construction for which the Government contends if it can be avoided. In that case, two of the judges of this court dissented, one on one ground and one on another, but all five judges agreed that the indefinite-quantities provision of the contract in that case was in conflict with the rest of the contract and, therefore, had to fall. Similarly, we hold that it is in conflict with the specific provisions of Section A of this contract and with the manifest intention of the parties and, therefore, must fall.

■ We think defendant was obligated to deliver to plaintiff the machines specified in the contract for dismantling and for either repair or reassembling. It appears that only 38 machines were actually delivered. In its motion for summary judgment, plaintiff says that this increased its per unit costs and necessitated the making of an equitable adjudgment under the "Changes" article of the contract. If plaintiff's costs per unit were actually increased by the failure of the Government to deliver only 38 of the 183 items specified, it would seem that plaintiff is entitled to an equitable adjustment. But neither the contracting officer nor the Armed Services Board of Contract Appeals have found that plaintiff's unit costs were actually increased and, if they were, what would be an equitable adjustment. Both of these determinations are questions of fact. United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L. Ed. 49 (1942). The contract clothes the contracting officer, in the first instance, with authority to make such findings and, in the second instance, the Board of Contract Appeals. Neither one did so.

In such case this court, having taken jurisdiction of the controversy, must do what the contracting officer should have done. We must find whether plaintiff's

unit costs were increased and, if so, the amount of the equitable adjustment to which plaintiff is entitled. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. ——, decided July 12, 1963; H. R. Henderson & Co., Inc. v. United States, Ct.Cl. No. 319–60, this day decided. The case is remanded to the trial commissioner for this purpose.

DAVIS, Judge (concurring).

I join the opinion of the court which decides, as a matter of law, that plaintiff's interpretation of the contract is correct. But I append a few sentences on the finding by the Board of Contract Appeals that plaintiff itself understood that the contract fell into the indefinite-quantities class. This finding rests, entirely, on statements and occurrences after the revision of January 16, 1956; the Board admits that there is no relevant extrinsic evidence as to the parties' intention prior to or at the time of the modification. Some of the post-contract items cited by the Board indicate that plaintiff later became troubled by the language inserted in Section B by the revision of January 1956, but the facts on which the Board relies do not add up to an acceptable showing that plaintiff acquiesced in the defendant's interpretation of the modified contract while it was being performed. For instance, admissions that a contract embodies phrases which appear to support the other party do not amount to an agreement that he is also right if the contract is read as a whole. Similarly, mere failure to raise legal points promptly, or to ask for relief as soon as possible, can rarely be elevated, by itself, into a "practical" acceptance of the other side's construction of the contract (so long as the issues are timely presented, as they were here since the Board considered them on their merits). There often are other substantial explanations for such conduct. In this case, the plaintiff's actions and inaction, prior to the termination of the last agreement in the series, were all thoroughly consistent with a hope that the successive contracts would ultimately afford plaintiff adequate work, and therefore that it need not yet bring up the matter of increased compensation. In a word, the neutral facts to which the Board points form an insubstantial basis for finding any dispositive practical construction of the contract by this contractor.