INTERNATIONAL DATA PRODUCTS
CORP., Plaintiff,

v.

The UNITED STATES of
America, Defendant.

Nos. 01–459 C, 03–2515 C.

United States Court of Federal Claims.

March 28, 2005.

Edward J. Tolchin, Fettmann, Tolchin & Majors, P.C., Fairfax, Virginia, for plaintiff.

John H. Williamson, Trial Attorney, Deborah A. Bynum, Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C. for defendant. Maj. Jacqueline Posner, Trial Attorney, Air Force Legal Services Agency and E. Michael Chiaparas, Deputy Director, Defense Contract Management Agency, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

These consolidated cases are before the Court on Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment As To Liability. Oral argument was held on March 17, 2005. For the reasons set forth below, plaintiff's motion is GRANTED in part and DENIED in part and defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are undisputed unless otherwise indicated. On May 5, 1997, the Air Force awarded Contract F01620–97–D–001 ("Desktop V") to plaintiff, International Data Products ("IDP"). IDP was a small minority-owned business and participant in the United States Small Business Administration's ("SBA") 8(a) program. At the time it submitted its proposal for the Desktop V contract, IDP had served the Government for "the past twelve years." Def.'s App. at 100. The Desktop V contract was a fixed-price, indefinite-delivery, indefinite-quantity ("IDIQ") contract to provide computer systems, computer and warranty services, and software products and upgrades to the Air Force and other federal agencies. Section I of the contract incorporated by reference the provision at Federal Acquisition Regulation ("FAR") 52.216–22, entitled "Indefinite Quantity." Def.'s App. at 49. That clause provided in pertinent part as follows: "This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The

quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract." 48 C.F.R. § 52.216–22(a) (1984).

The Desktop V contract consisted of one base year and four one-year options, Compl. (No. 03–2515 C) ¶ 5, and required the Government to place a minimum quantity of $100,000 in orders during the base year. Def.'s App. at 9. The contract stated that the Government's exercise of an option would not re-establish the contract minimum for the option period. *Id.* The contract set the maximum quantity of orders at $729,010,929. *Id.* The contract further provided that the total estimated quantities were $100 million. *Id.* The contract required IDP to provide products "and bundled support services" identified in IDP's proposal and in Sections B and C of the contract. Def.'s App. at 10–11. IDP's proposal listed products with a "3–yr warranty." Def.'s App. at 89–90. Unit prices for products, including warranties and other bundled support services, were stated in Section B of the contract. Def.'s App. at 18–25. IDP's proposal, which was incorporated into the final contract, included an agreement to maintain certain inventory levels.

In February 1998, IDP informed the Government of an agreement it had entered into with Dunn Computer Corporation, a non–8(a) concern, to sell IDP. Compl. (No. 03–2515 C) ¶ 6. As a result, Section 8 of the Small Business Act, 15 U.S.C. § 637 (2000), required the Government to terminate the Desktop V contract for convenience. Compl. (No. 03–2515 C) ¶ 7. Pursuant to section 637(a)(21)(B) of title 15, the Air Force sought a waiver of the statutory 8(a) requirement that the Government terminate the Desktop V contract with IDP. The SBA denied the Air Force's request for a waiver, and the denial was sustained by the SBA's Office of Hearings and Appeals. *Int'l Data Prods. Corp.,* SBA No. BDPW–125, 1999 WL 1007639, 1999 SBA8A LEXIS 15 (Aug. 31, 1999). On October 8, 1999, the contracting officer notified IDP that the contract was "completely" terminated for convenience, but that the termination did not affect the warranties and upgrades for products purchased

by the Government. Compl. (No. 03–2515 C) ¶ 11; Def.'s App. at 322–23.

On May 5, 1997, the award date of the contract, the Government placed an initial order of $109,575, later modified to $100,436. Def.'s App. at 69, 87. By the time the Desktop V contract was terminated in October 1999, the Government had ordered and paid IDP for over $35 million worth of products during the almost two and one-half years of the contract. Def.'s App. at 157.

After contract termination, IDP continued to perform the warranty and software upgrade work, as directed by the termination notice. By letter dated April 11, 2000, IDP notified the Air Force that IDP would cease all performance. Def.'s App. at 327–28. In the letter, IDP demanded a contracting officer's final decision that the Government was not entitled to continue to hold IDP liable for warranty services and software upgrades. *Id.;* Compl. (No. 01–459 C) ¶ 13. The contracting officer's final decision, dated August 8, 2000, denied IDP's claim. Compl. (No. 01–459 C) ¶ 14. IDP filed case No. 01–459 C on August 7, 2001, seeking a declaratory judgment "that defendant may not hold IDP to the [Desktop V] contractual provisions which could otherwise require IDP to provide warranty and software upgrade services to [the Government]." Compl. (No. 01–459 C) ¶ 17.

On September 18, 2002, IDP filed a certified claim with the contracting officer, seeking termination and other costs that IDP claimed it was owed by the Government. Compl. (No. 03–2515 C) ¶ 13. The claim sought $1,247,915 for inventory and restocking costs, $440,990 for warranty services and software upgrades provided after the contract was terminated, and $40,300 for executive, legal, and accounting time spent preparing and prosecuting IDP's termination settlement proposal. *Id.* The contracting officer issued a final decision on November 15, 2002, denying IDP any termination costs. Compl. (No. 03–2515 C) ¶ 14. On October 30, 2003, IDP filed a second suit in this Court, No. 03–2515C, seeking termination costs sought in its certified claim. Compl. (No. 03–2515 C) ¶ 16. By order of this

Court dated March 23, 2004, the second suit was consolidated with the first.

The parties' cross-motions raise two issues:

1. Whether the Government is liable for termination costs if the Government satisfied the Desktop V contract minimum before the contract was terminated.

2. Whether IDP was responsible to continue to provide warranty and upgrade services after the Desktop V contract was terminated for convenience.

## DISCUSSION

### I. Standard For Summary Judgment

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one that will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant for summary judgment bears the burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. This case involves questions of contract and statutory interpretation, both of which are questions of law, and thus, amenable to summary disposition. *Kent v. Principi*, 389 F.3d 1380, 1384 (Fed.Cir.2004) (citing *Lane v. Principi*, 339 F.3d 1331, 1339 (Fed.Cir.2003) (statutory interpretation is a question of law)); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985) (interpretation of a government contract is a question of law).

■ The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Northrop Grumman Corp. v. United States*, 50 Fed.Cl. 443, 457 (2001) (citing *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988)). It does not necessarily follow that if one motion is rejected, the other is supported. *Prineville*, 859 F.2d at 911. The court must evaluate each party's motion on its own merits and resolve all reasonable inferences against the party whose motion is under consideration. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992).

### II. IDP is Not Entitled To Recover Termination Costs

#### A. The Termination For Convenience Clause

The termination clause included in the contract provided in pertinent part:

(4) The Government shall pay:

(i) The reasonable, allowable and allocable costs, determined in accordance with FAR Part 31, incurred by the contractor, its subcontractors and suppliers prior to the date of termination for completed work that has not previously been paid for, for work in process and materials directly related to the terminated portion of the contract, excluding the cost of any work in process or materials that can be used by, canceled or sold without cost to the contractor, its subcontractors, or suppliers; for orderly phase out of performance if requested by the Government; and, for preparation and settlement of the contractor's, its subcontractor's and supplier's termination claims; and,

(ii) A reasonable profit on the terminated portion of the work.

(5) In no event shall the sum of the termination amounts payable and any amounts paid for items delivered under the contract exceed the total contract price.

48 C.F.R. § 252.211–7000 (1991).

The parties dispute what constitutes the "total contract price." Plaintiff contends that the "total contract price" is, at least, the total estimated quantity—in this case, $100,000,000. Pl.'s Mem. in Opp'n of Mot. for Summ. J. & in Supp. of Pl.'s Mot. for Summ. J. as to Liability ("Pl.'s Br.") at 11. The Government asserts that the "total con-

tract price" was reached when the Government exceeded the contract minimum of $100,000. Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 10.

## B. This Was an IDIQ Contract

■ The first sentence of Section B.1.a. of the contract stated that "[t]his is a firm fixed-price (FFP), indefinite delivery, indefinite quantity (ID/IQ) contract." Def.'s App. at 8. The Desktop V contract complied with the requirements for an enforceable IDIQ contract set forth in the FAR: "The contract must require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services." 48 C.F.R. § 16.504(a)(1). Section B.2.a. of the contract stated that "[i]n the base year of the contract, the minimum amount for award will be $100,000." Def.'s App. at 9. Section B.2.b. provided that "the exercise of an option does not re-establish the contract minimum." *Id.* The Federal Circuit has ruled that in an IDIQ contract, "[m]inimum quantities are not required to be associated with each option period." *Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 800 (Fed.Cir.2002).

The Desktop V contract also met the FAR requirement that for an IDIQ contract to be binding, "the minimum quantity must be more than a nominal quantity." 48 C.F.R. § 16.504(a)(2). The IDIQ contract at issue in *Varilease,* like the Desktop V contract, contained a minimum quantity of $100,000 for the base period only, and no contract minimums for the option periods. *Varilease,* 289 F.3d at 797. Although the Federal Circuit did not specifically address whether $100,000 was more than a nominal quantity, it implicitly approved this amount by ruling that the contract "clearly sets forth the essentials of an ID/IQ contract." *Id.* at 799. In anther case involving an IDIQ contract, the Federal Circuit treated as enforceable an IDIQ contract whose minimum quantity was much lower: "sales that would lead to $100 in revenue." *Travel Ctr. v. Barram,* 236 F.3d 1316, 1319 (Fed.Cir.2001). This court has ruled that a contract minimum of $50,000 in supplies and services in an IDIQ contract was "more than a nominal amount." *Abatement Contracting Corp. v. United States,* 58

Fed.Cl. 594, 604 (2003). Thus, the contract minimum of $100,000 in the Desktop V contract was more than a nominal amount.

## C. "Total Contract Price" in an IDIQ Contract is the Price for the Minimum Value of Services the Government was Obligated To Procure Plus the Value of Any Services it Ordered in Excess of That Minimum

### 1. *The Government's Obligations Under an IDIQ Contract are Limited*

■ The Federal Circuit decisions establish that once the Government meets the contract minimum set in an IDIQ contract, it has no further legal obligations under the contract. In *Varilease,* the Federal Circuit ruled that the Government's "only obligation was to order at least the minimum quantity of relevant computer maintenance during the initial six-month term of the contract." 289 F.3d at 800–01. Likewise in *Travel Centre,* the Federal Circuit ruled that the Government "was only required to purchase the minimum quantity stated in the contract— sales that would lead to $100 in revenue." 236 F.3d at 1319. The Court of Federal Claims has similarly held that "with the purchase of at least the Contract minimum, the government's obligations thereunder were extinguished." *Abatement Contracting,* 58 Fed.Cl. at 604; *see also Rice Lake Contracting, Inc. v. United States,* 33 Fed.Cl. 144, 154 (1995).

In *Rice Lake,* plaintiff entered into a contract with the Air Force to paint interior walls and maintain hardwood floors in military family housing. *Id.* at 147. The contract contained the "Indefinite Quantity" clause set forth at 48 C.F.R. § 52.216–22 (1984). *Id.* The contract minimum was set at $5,000. *Id.* Pursuant to the terms of the contract, the government ordered $59,138.94 worth of services before terminating the contract. *Id.* at 148. That total was more than eleven times greater than the required minimum order. *Id.* As a result of the termination, plaintiff submitted a claim to the contracting officer for costs in the amount of $55,623.65. *Id.* The contracting officer denied the majority of the claim and explained

that the contractor was not entitled to termination costs because the Government discharged its liability by purchasing services under the contract in an amount that exceeded the contract minimum. *Id.* at 148–49. The court stated that because "the contract at issue is an indefinite quantity contract, the legal obligation of the government was only to satisfy the stated minimum in the contract." *Id.* at 154. Accordingly, plaintiff was not entitled to the damages it sought. *Id.*

■ In determining what constitutes the "total contract price" in the context of an IDIQ contract, the Court is guided by the decision of the Armed Services Board of Contract Appeals ("ASBCA" or "Board") in *Okaw Indus., Inc.,* ASBCA Nos. 17,863 and 17,864, 77–2 B.C.A. (CCH) ¶ 12,793, 1977 WL 2259 (1977).[1] In *Okaw,* the contractor and the Government entered into an IDIQ contract. The Government ordered more than the minimum value of services required by the contract. The contract was thereafter terminated for convenience. *Id.* Okaw advanced the same arguments as IDP, citing similar case law and placing a "heavy emphasis on the concept of fairness in support of its position." *Id.* The ASBCA found the cases cited by Okaw to be distinguishable, noting that there is "a distinct difference between a requirements contract and an indefinite quantity contract." *Id.* The Board also found unpersuasive Okaw's "fairness" argument. *See infra* Part II.C.2. The Board ultimately concluded that "the contract price, for the purpose of establishing the payment limit set forth in the Termination for Convenience provisions, was the price for the minimum value of services the Government was obligated to procure plus the value of any services it ordered in excess of that minimum." *Id.* The Court finds the Board's decision on this issue to be well-reasoned, persuasive, and consistent with the decisions of the Federal Circuit and the Court of Federal Claims regarding the obligations of the Government under an IDIQ contract.

Accordingly, the Court holds that the total contract price of the Desktop V contract is approximately $35 million dollars, *see* Def.'s

App. at 157, 159, which is comprised of the minimum $100,000 of products and services the Government was obligated to purchase plus the value of products and services it procured in excess of the minimum. Thus, by placing orders that met and exceeded the minimum value, the Government has already paid to IDP the "total contract price." Because the termination clause provides that "[i]n no event shall the sum of the termination amounts payable and any amounts paid for items delivered under the contract exceed the total contract price," IDP is not entitled to termination costs.

### 2. *Contrary to Plaintiff's Argument, Considerations of Fairness Support the Government's Position*

Plaintiff argues that fundamental fairness requires that the "total contract price" be the total estimated quantity of $100 million rather than the minimum award of $100,000. Pl.'s Br. at 11. IDP contends that the language in the contract stating that "orders beyond the minimum will be determined by user needs," demonstrates that the parties never intended for the $100,000 minimum to be "the bottom line commitment to IDP or from IDP." Pl.'s Br. at 11–12. Plaintiff also appears to assert that the Government somehow mislead IDP into believing that a minimum of $100,000,000 in orders would be placed, and then the Government simply terminated for convenience. Pl.'s Br. at 12.

The Court of Claims has addressed the notion of fairness in an IDIQ contract. *See Dot Sys., Inc. v. United States,* 231 Ct.Cl. 765, 1982 WL 25218 (1982). In *Dot Systems,* the solicitation for bids made clear that the contract was an IDIQ contract and the contractor understood that the estimates contained in the solicitation were not guarantees of amounts required. *Id.* at 769. In analyzing whether the Government had breached the contract, the court stated, "a contractor cannot sign a contract which allocates the risk to it and then ... later come to this court, having lost its gamble, and insist that the risk be placed on the Government." *Id.* at 768 (citing *Webco Lumber, Inc. v. United*

---

1. Though not binding on this Court, the views of the Boards of Contract Appeals are given careful

consideration. *Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998).

*States,* 230 Ct.Cl. 457, 677 F.2d 860 (1982); *Caffall Bros. Forest Prods., Inc. v. United States,* 230 Ct.Cl. 517, 678 F.2d 1071 (1982); *Gregory Lumber Co. v. United States,* 230 Ct.Cl. 1041, 1982 WL 25316 (1982)). Similarly, in *Okaw,* the ASBCA rejected plaintiff's contention that the balance of fairness weighed in the contractor's favor. 77–2 B.C.A. (CCH) ¶ 12,793. "The appellant must also recognize that fairness must be considered when evaluating the Government's obligations under the contract. In this instance appellant knew, or should have known, that the Government was obligated only to order the specified minimum quantity set forth in the contract." *Id.*

In the case at bar, plaintiff represented that it was an experienced government contractor, Def.'s App. at 100, and the contract clearly stated that it was an IDIQ contract, Def.'s App. at 8. IDP, therefore, knew or should have known that the Government was only obligated to order the minimum quantity and assumed the risk that it would not order more than $100,000 of products and services. Additionally, contrary to plaintiff's insinuation, this is not a situation in which the Government acted in bad faith. The Government terminated the contract because it was required to by statute after IDP entered into an agreement to sell its stock to a non–8(a) concern. Thus, plaintiff's suggestion that the Government somehow lured plaintiff into the Desktop V contract and then simply terminated the contract after meeting its minimum obligations is unfounded. In fact, the Government ordered products and services under the contract in excess of 350 times the minimum amount of $100,000. Def.'s App. at 157, 159.

### 3. *The Case Law Cited by Plaintiff is Inapposite*

In further support of its argument that the Court should adopt the total estimated quantity of $100 million as the "total contract price," plaintiff cites *Albano Cleaners, Inc. v. United States,* 197 Ct.Cl. 450, 455 F.2d 556 (1972), *E.H. Sales, Inc. v. United States,* 169 Ct.Cl. 269, 340 F.2d 358 (1965), and *Goldwasser v. United States,* 163 Ct.Cl. 450, 325 F.2d 722 (1963). However, the cases cited by plaintiff are distinguishable.

In *Albano Cleaners,* the court found that the contract at issue, despite having an indefinite quantities clause, was in fact a requirements contract:

> The controversy is, instead, about terminating a one-year's contract after less than a month. Over the contract term plaintiff did not have a right to any specific amount of business (the amount in part depending on the needs of incoming vessels), but it did have a right to receive whatever business of the type covered by the contract was generated in the specified contract areas ("Zones") for the full one year contract period.

197 Ct.Cl. at 459, 455 F.2d at 561. The requirements contract at issue in *Albano Cleaners* is fundamentally different than the IDIQ contract in the case at bar. In a requirements contract, " 'the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract.' " *Mason v. United States,* 222 Ct. Cl. 436, 442, 615 F.2d 1343, 1346 (1980) (quoting *Media Press, Inc. v. United States,* 215 Ct.Cl. 985, 986, 566 F.2d 1192 (1977)). In an indefinite quantity contract,

> the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. It differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller.

222 Ct.Cl. at 443 n. 5, 615 F.2d at 1346 n. 5. Because of the significant distinction between the contracts at issue, the decision in *Albano Cleaners* is not relevant to our analysis.

Likewise, *Goldwasser* is irrelevant because that case also involved a requirements contract. 163 Ct.Cl. at 453, 325 F.2d at 723. The statement of work clause in *Goldwasser* stated that plaintiff would print weekly issues of the New York Naval Shipyard publi-

cation for a contract term of 12 months. 163 Ct.Cl. at 454, 325 F.2d at 723. The work required that plaintiff print a minimum of 10,000 copies per issue. *Id.* The contract, however, had an indefinite quantities clause that provided a contract minimum of $100. *Id.* The court found that the two clauses were "directly contradictory; one or the other must fall." 163 Ct.Cl. at 453, 325 F.2d at 723. The indefinite quantities clause was the one to "fall," because it was a standardized clause whereas the statement of work was drafted specifically for that contract and "[t]he specific provision must prevail over the general." 163 Ct.Cl. at 453–54, 325 F.2d at 723. The court determined that the contract was a requirements contract, and thus found that the Government's obligation was not extinguished simply by purchasing $100 worth of the publication. 163 Ct.Cl. at 454–55, 325 F.2d at 724. The fact that *Goldwasser* was a requirements contract was dispositive in that case. Because Desktop V is an IDIQ contract, the holding in *Goldwasser* is inapposite.

In *E.H. Sales*, the court found that the contract at issue was a contract under which "the Government obligated itself to deliver specific machines and not an indefinite number of them." 169 Ct.Cl. at 274, 340 F.2d at 361. The court explained that the clause providing for a $100 minimum obligation by the Government "is applicable and entirely proper in a contract where the Government does not know what its requirements will be, but it clearly has no place in a contract calling for the furnishing of specifically described items." *Id.* The court then held that in the particular contract at issue "[b]ecause [the contract minimum] paragraph is so completely contrary to the manifest intention of the parties, we think it must be disregarded." *Id.* Again, the type of contract was dispositive in *E.H. Sales*, and the court's opinion indicates that if that had been an IDIQ contract, the $100 minimum obligation would have been upheld.

Based on the foregoing, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted regarding plaintiff's claim for termination costs.

## III. IDP Was Not Required To Continue To Provide Warranty and Upgrade Services Under the Desktop V Contract

■ In 1998, when IDP entered into an agreement with Dunn Corporation, a non–8(a) concern, to purchase IDP, Compl. (No. 01–459 C) ¶ 6, the Government was required by the Small Business Act to terminate the Desktop V contract for convenience or seek a waiver allowing contract performance to continue as provided by 15 U.S.C. § 637(a)(21)(B). The Air Force sought a waiver, which the SBA denied. The denial was sustained by the SBA's Office of Hearings and Appeals. *Int'l Data Prods.*, 1999 SBA8A LEXIS 15. Thereafter, on October 8, 1999, the Government notified IDP that it was terminating the Desktop V contract for convenience. The Contracting Officer, Kay Walker, issued the following termination notice:

> Contract No. F01620–97–D–0001 is completely terminated under clause DFARS 252.211–7000, Termination—Commercial Items, effective immediately. Immediately stop all work, terminate subcontracts, and place no further orders except to the extent that you or a subcontractor wish to retain and continue for your own account any work-in-process or other materials. . . . This termination will not affect the rights and liabilities of the parties, arising under the contract or otherwise, concerning defects, guarantees or warranties relating to any articles or component parts furnished to the Government by the Contractor under the contract or this agreement, nor the rights and liabilities of the parties concerning software upgrades as required by Section C of the contract.

Def.'s App. at 322.

■ The Government's attempt to require IDP to perform the warranty and upgrade work was improper in this situation. Here, Congress mandated that the Government terminate for convenience:

> Subject to the provisions of subparagraph (B), a contract (including options) awarded pursuant to this subsection *shall* be performed by the concern that initially re-

ceived such contract. Notwithstanding the provisions of the preceding sentence, if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, such contract or option *shall* be terminated for the convenience of the Government
. . . .

15 U.S.C. § 637(a)(21)(A) (emphases added). It is well settled that 'shall' indicates a command. *United States v. Thoman,* 156 U.S. 353, 359–60, 15 S.Ct. 378, 39 L.Ed. 450 (1895). This is not a case in which the agency had discretion to terminate the contract. Rather, in the event that a non–8(a) concern enters into an agreement to take over an 8(a) contractor, the Government is required (absent SBA approval of a waiver) to terminate the contract for the convenience of the Government.

On its face, the statute does not allow for a partial termination of the contract, and in fact, the CO stated that the contract was "completely terminated," Def.'s App. at 322. A review of the statute and its legislative history supports the conclusion that termination pursuant to 15 U.S.C. § 637(a)(21)(A) must be of all work under the contract. The Business Opportunity Development Reform Act of 1988 ("Reform Act"), Pub.L. No. 100–656, 102 Stat. 3853, added the termination for convenience and waiver provisions of the Small Business Act. The stated purposes of the Reform Act were, among others, to "ensure that program benefits accrue to individuals who are both socially and economically disadvantaged" and to "ensure integrity, competence, and efficiency in the administration of business development services and the Federal contracting opportunities made available to eligible small businesses." § 101, 102 Stat. at 3856 (codified at 15 U.S.C. § 636 note). Both the House of Representatives and the Senate were concerned about non-Small Business entities acquiring and performing 8(a) contracts. The House Committee on Small Businesses stated:

We are advised that at least on seven past occasions section 8(a) firms have sold out to large non-disadvantaged businesses immediately after or near the expiration of

their fixed program participation terms. The new owners receive the benefits of all 8(a) contracts and contract options, valued at tens of millions of dollars, held at the time of sale . . . . [L]arge non-disadvantaged firms, seeking entry into a particular government field of contracting, can find no easier way than buying out the stock of a firm well provisioned with sole source contracts.

H.R.Rep. No. 100–460, at 35 (1987). The Senate likewise noted:

This section concerning performance of contracts awarded under Section 8(a) is intended to ensure that the benefit [of such contracts] flow [sic] only to those who are the intended beneficiaries of this program. . . . [T]he 8(a) program has been maligned and plagued by instances in which 8(a) contracts have effectively been transferred to non-disadvantaged businesses through sale or merger of the 8(a) concern.

S.Rep. No. 100–394, at 73 (1988) *reprinted in* 1988 U.S.C.C.A.N. 5401, 5449. The clear intention of the Reform Act was to prevent non-disadvantaged businesses from performing 8(a) contracts. That goal is achieved only if the termination requires the contractor to cease *all* performance under the contract, including warranty and upgrade work.

The Government argues that plaintiff was required to perform because the termination notice reserved the rights to warranty and software upgrades, and because the Government paid for these services under the contract. Neither of these arguments is persuasive. Congress was aware of and considered the fact that terminating a contract pursuant to 15 U.S.C. § 637(a)(21)(A) would not always be in the best interests of the agency. Accordingly, the Small Business Act provides a mechanism for avoiding a termination by allowing the "Administrator . . . on a nondelegable basis" to grant a waiver when "[t]he head of the contracting agency for which the contract is being performed certifies that termination of the contract would severely impair attainment of the agency's program objectives or missions." 15 U.S.C. § 637(a)(21)(B)(ii).

Congress weighed the inconvenience and expense of termination to the Government against the goals of the 8(a) program and concluded that exceptions to termination should be made only when the agency's objectives would be "severely impaired." Congress determined that not every loss or inconvenience to the agency would prevent termination of the contract. It is not up to the Court or the contracting officer to strike a different balance from that set forth in the statute. The Government's position is that despite the decision of the SBA Administrator to deny the Air Force's request for waiver, the contracting officer can effectuate a partial waiver of the requirement to terminate simply by stating in the termination notice that the contractor is still required to perform certain work under the contract. That argument is inconsistent with the plain language of the statute that allows only the SBA Administrator to grant waivers.

Because all work must cease when the Government terminates for convenience pursuant to 15 U.S.C. § 637(a)(21)(A), IDP was not obligated to continue to provide warranty and upgrade services under the Desktop V contract. Plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied regarding the issue of whether IDP was obligated to continue to provide warranty and upgrade services under the Desktop V contract.

### CONCLUSION

For the reasons set forth above, plaintiff's motion is GRANTED in part and DENIED in part and defendant's motion is GRANTED in part and DENIED in part. The parties shall contact chambers within five days of receipt of this opinion and order to schedule a status conference to determine the course of further proceedings for resolving the issue of quantum.

IT IS SO ORDERED.