**COASTAL STATES PETROCHEMICAL COMPANY**

v.

**The UNITED STATES.**

**No. 190–72.**

United States Court of Claims.

July 8, 1977.

John J. Reed, Washington, D. C., attorney of record, for plaintiff; Hudson, Creyke,

Koehler & Tacke, Washington, D. C., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and BENNETT, JJ.

## OPINION

KASHIWA, Judge:

The primary issue in this case is one of contract interpretation. The point in controversy is whether the United States was contractually obligated to purchase from the plaintiff, Coastal States Petrochemical Company ("Coastal States"), the requirements for JP-4 fuel[1] that existed during the contract term. Plaintiff contends that the contract between the parties was basically a requirements type contract and that the United States was contractually bound to purchase certain of its fuel requirements during the contract period from Coastal States. The United States, on the other hand, denies any such obligation. Its position is that the contract in question was an indefinite quantity type contract and that, in keeping with that type of purchase agreement, the only obligation it owed to plaintiff was to satisfy a minimum purchase requirement.

The case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Harry E. Wood, which he has submitted in accordance with Rule 134(h) on May 25, 1976. Although we borrow from much of the trial judge's recommended opinion, we come to different results.

After having carefully considered the trial judge's recommended decision and findings of fact, the defendant's exceptions thereto, and the parties' briefs, after oral argument, we agree with the defendant that the contract in issue is an indefinite

---

1. JP-4 fuel is a volatile mixture of kerosene, raffinate grade gasoline (82 octane), and naphtha. Although the fuel, in the United States, is limited in use to military applications, its components can be utilized commercially.

**2**

quantity type contract and that the Government in good faith has met all obligations which it had to plaintiff under the contract. Accordingly, the trial judge's findings of fact,[2] recommended decision, and conclusion of law are modified to accord with the facts and law set forth below.

I

*Conventional Government Procurement Patterns:* The Defense Fuels Supply Center ("DFSC"), Defense Supply Agency, Department of Defense ("DOD"), has the mission of procuring, among other things, JP-4 jet fuel for the military services and federal civil agencies on a worldwide basis.[3] To fulfill that mission, DFSC procures JP-4 jet fuel every 6 months in such enormous quantities that no single supplier is capable of satisfying its demands. A DFSC invitation for bids for such fuel is usually sent to more than 150 suppliers, and multiple awards of some 60 to 80 contracts are invariably necessary to secure the requisite volume of such fuel at the lowest prices obtainable.

To some time in 1967, the Domestic Fuels Division, DFSC, solicited domestic suppliers of JP-4 jet fuel for use in the United States, including Alaska and Hawaii. In so doing, the Domestic Fuels Division utilized the DOD import quota[4] in procuring the fuel from refineries in the Caribbean Sea.

During that same period, DFSC's Overseas Division procured the anticipated needs of United States forces in Europe and in the Western Pacific by contracts, negotiated with foreign refiners located outside the United States, its territories, and possessions, for delivery of JP-4 jet fuel to Europe and to the Western Pacific.

As military operations in the Western Pacific and in Southeast Asia steadily increased, however, defendant found not only that supplies of JP-4 jet fuel normally imported for domestic use were required for shipment to Europe and Southeast Asia but also that it was necessary to procure additional quantities of such fuel from United States domestic sources, at higher prices, for shipment to Southeast Asia and Europe. Thus, by late 1967, a departure from the traditional patterns of procurement of JP-4 jet fuel described above occurred, in that quantities of JP-4 jet fuel needed for use in Europe and in the Western Pacific were included in *domestic* solicitations, with such "overseas" quantities designated for statistical purposes as "restricted to U. S. refined product," in order to return to this country as many procurement dollars as possible.

*The Solicitation:* On February 5, 1969, DFSC issued bid solicitation DSA 600–69–B–0161 (also "IFB"), involving a 6-month purchase program of a portion of defendant's projected JP-4 jet fuel needs for the period July 1 to December 31, 1969.[5] The solicitation was one of a continuing series of semi-annual, formally advertised invitations for bids issued by the Domestic Fuels Division, DFSC, to supply the anticipated needs of the Army, Navy, and Air Force, and some federal civil agencies, for JP-4 jet fuel for use principally within the United States; consistent with the departure from tradition described above, however, it also included a substantial quantity of such fuel intended for ultimate receipt and use by United States armed forces overseas.

2. The trial judge's findings of fact, copies of which have been distributed to the parties, are not printed because those essential to the decision appear in this opinion.

3. Anticipated needs of JP-4 jet fuel for use outside the United States, its territories, and possessions are traditionally obtained by contracts negotiated by the Overseas Division of the DFSC, under the authority of 10 U.S.C. § 2304(a)(6) (1970), with foreign refiners located outside the United States, its territories, and possessions.

4. Import quotas are allocations granted by the Department of the Interior to historical importers (including DFSC) to import a maximum quantity of a certain number of barrels per day of foreign-finished petroleum products into the United States. The use of DOD's import quota in procuring JP-4 jet fuel was suspended late in 1967.

5. As will appear, defendant issued five other solicitations for bids calling for delivery during that same period of vast amounts of JP-4 jet fuel for overseas needs.

The IFB, issued to 168 firms,[6] involved total estimated JP-4 jet fuel needs of 2,691,091,530 gallons, to be delivered to more than 300 specified military destinations ("using activities") throughout the United States, in Europe, and in the Pacific. The IFB estimate of quantities of JP-4 jet fuel needed for "offshore" use (that is, for use by all of the specified using activities located other than in one of the 50 States or the District of Columbia) was 371,960,000 gallons.

The IFB contained a 41-page schedule of anticipated fuel needs for the period July 1 to December 31, 1969, listing the more than 300 separate military and civilian using activities both within and outside the United States and setting forth an estimate, in gallons, of each such activity's JP-4 jet fuel needs for that 6-month period.

The schedule also grouped the using activities into four geographic areas (East Coast, Gulf Coast, Inland, and West Coast). Bidders were invited to bid on all or any portion of the anticipated fuel needs included in the IFB and were advised of defendant's preference for bids on an origin basis but were also advised that, with the exception of one item, bids could be submitted on either an origin or a destination basis.[7]

The exception referred to was Item 365, designated "West Coast Offshore." As to Item 365, the ultimate destinations of the 189 million gallons of JP-4 jet fuel involved were impossible to predict; so the solicitation indicated that only offers on an origin basis would be considered. With respect to this bid item, the IFB provided that:

Item 365 is a one time procurement in support of Southeast Asia and in implementation of the Balance of Payments Program. The requirements represented by the above are needed at various Pacific bases. The requirements at individual bases are not certain. Accordingly offers are desired on an origin basis only and

destination offers for this item will not be considered. *For evaluation purposes only, the destination will be considered to be Guam.* * * * [Emphasis in original.]

The IFB also contained a "Balance of Payments Restrictions" clause providing that only products refined in the United States were to be considered for those offshore items. However, the balance of payments clause in the domestic IFB did not preclude suppliers which were covered by both an offshore IFB and the domestic IFB from furnishing foreign-refined JP-4 fuel to the offshore using activities; it merely precluded suppliers bidding under the domestic IFB from furnishing foreign-refined JP-4 fuel for the offshore quantities listed therein.

The IFB also stated that DOD did not at that time intend to use any of its finished products import quota for purchases under the contract.

The offshore portion of the IFB, or 371,960,000 gallons, represented only a fractional part of defendant's total projected overseas needs for JP-4 jet fuel during the second half of 1969. In February and March 1969, five other solicitations for bids calling for delivery, during that same period, of JP-4 jet fuel to defendant for overseas needs were issued.

These five parallel solicitations ("offshore IFBs") were not subject to any balance of payments restrictions, and fuel supplied to defendant pursuant to them was not limited to "U. S. refined only" product. They invited offers for delivery of JP-4 jet fuel for use in Vietnam, Thailand, the Philippines, Okinawa, Japan, Korea, Taiwan, Turkey, Italy, Libya, the United Kingdom, and Germany. As a result of the offshore IFBs, contracts covering 1,396,304,000 gallons of JP-4 jet fuel were awarded to some 31 foreign suppliers. At the time here relevant, foreign refiners could, and did, under-

6. In response to the IFB, defendant received 77 bids on one or more of the more than 300 items contained therein; and 71 domestic suppliers (including plaintiff) were awarded contracts.

7. A bid, on either an origin or a destination basis, was evaluated by defendant on a least-cost approach, i.e., the lowest laid-down price (cost plus delivery expense) to a particular destination.

bid domestic refiners subject to balance of payments restrictions.

While most of the overseas points of use, or delivery, specified in the offshore IFB differed from the overseas delivery points specified in the domestic IFB, the offshore IFBs and the domestic IFB did overlap, to a certain degree, in terms of actual points of use, or delivery. For example, domestic IFB Item 365 dealt with the estimated needs of "various Pacific bases" and the offshore IFBs dealt with estimated needs in Vietnam, Thailand, the Philippines, Okinawa, Japan, Korea, and Taiwan.

*The Contract Awarded to Coastal States:* Plaintiff responded to the IFB on March 14, 1969, and on May 28, 1969, plaintiff was awarded a contract to supply to defendant an estimated 182,516,000 gallons of JP-4 jet fuel for a total contract price of $19,017,842.40. Of this total gallonage amount, 151,200,000 gallons were destined for overseas locations;[8] the balance, 31,316,000, being for domestic destinations.

The contract thus committed plaintiff to supply to defendant an estimated 30 million gallons of JP-4 jet fuel per month, if ordered, over a 6-month period. However, the contract also contained "final order" option provisions giving defendant a right to add to that obligation on the final order placed under any item of the Schedule and a "Scope of Contract" clause providing in part as follows:

IVB1a SCOPE OF CONTRACT (DFSC 1968 JUN)

(a) The Contractor shall furnish and deliver * * * the supplies and perform the services set forth in the Contract Schedule, for the prices payable according to the terms thereof, in such quantities as may be ordered by the Ordering Officer during the ordering period specified in the Schedule; in consideration therefor, the Government shall order, accept and pay for, on the terms and subject to the conditions set forth herein, supplies or services having an aggregate

value at the prices payable under this contract of not less than $100.00 * *.

Also, the "Termination for Convenience of the Government" clause in plaintiff's contract expressly provided that it "shall apply only to *orders* placed under this contract." (Emphasis supplied.)

*The Contract Cutback:* On July 28, 1969, shortly after these contracts became effective, DFSC was notified that worldwide Air Force usage of JP-4 jet fuel during the second half of 1969 would be substantially less than had been originally estimated, largely as a result of the sharp reduction in combat activities in Vietnam. On July 30, 1969, DFSC in turn notified plaintiff (and other United States suppliers) that due to declining worldwide requirements there would be some reduction in JP-4 jet fuel liftings during the 6-month period ending December 31, 1969, and that plaintiff would receive further advice as soon as possible.

On August 29, 1969, the Chief, Domestic Fuels Division, DFSC, wrote to plaintiff in part as follows:

* * * the demand for JP-4 to be supplied under your Contract * * * to the Air Force will be reduced from 182,516,000 gallons to 78,728,950 gallons. The Department of the Air Force is being instructed not to place orders in excess of the revised quantity through 31 December 1969 without prior approval of this Center.

* * * * * *

Over the remaining term of plaintiff's contract, the actual reduction from the estimated requirements stated therein amounted to 105,666,968 gallons, or some 57 percent of the initial contract amount.

*The Basis Upon Which the Cutback was Implemented:* The manner in which defendant decided to, and did, make the cutback in plaintiff's estimated contract amounts just described (and a cutback in the estimated amounts of JP-4 jet fuel set

8. Of the total "offshore" gallonage, a total of 100,961,100 gallons were required by the contract to be "refined in the United States"; ac-

cordingly, 50,238,900 gallons were not subject to such a restriction.

forth in the contracts of 14 other domestic suppliers as well) is at the center of the dispute between the parties.

Upon establishing that the maximum quantities of JP-4 jet fuel under contract to defendant for the period ending December 31, 1969, pursuant to all six of the solicitations described above, were approximately 399 million gallons in excess of the estimated reduced needs of the DOD for that period, DFSC weighed the alternative courses of action available to it. The decision ultimately approved by the Deputy Assistant Secretary of Defense (Supply and Services) was to reduce orders under *all* existing contracts on a most economical basis.

The reduction was carried out on a worldwide basis; fuel needs that remained open under all existing JP–4 jet fuel contracts for the period ending December 31, 1969, were competitively evaluated and were reallocated among defendant's existing suppliers on the basis of the respective prices they had initially offered. Thus, even though the existing JP-4 contracts had originally been let on the basis of separate prices bid under separate procurements, the reduction in fuel demand, principally in Southeast Asia, became the occasion for a competitive re-evaluation and re-routing of remaining worldwide needs on the basis of price alone. This actually represented a return to the channels of distribution that existed before the peak Vietnam fuel demands.[9]

In the re-evaluation, United States suppliers such as Coastal States were accorded no economic concession for the fact that they were contractually obligated to deliver, in accordance with the balance of payment restrictions in the contract and the foreign product import restrictions, fuel that had been domestically refined and which was higher priced than foreign-refined fuel. In other words, this competitive re-evaluation and re-allocation of remaining fuel demands was carried out notwithstanding the balance of payments and import

quota restrictions that originally applied in the JP-4 contract that had been awarded to plaintiff.

Following the re-evaluation, anticipated reductions in orderings of JP-4 jet fuel under all existing contracts were made and formally announced to plaintiff and to the 14 other affected companies by letters from DFSC dated August 29, 1969. The total reduction in orderings so announced amounted to 396,744,612 gallons.

Among these 15 suppliers, plaintiff absorbed the greatest share of the total cutback. Its original contract to supply a maximum 182,516,000 gallons was cut to 78,728,950 gallons, approximately a 57 percent reduction of the initial award. This difference of 103,787,050 gallons represented 26 percent of the total cutback that was effected.

As a result of this cutback, plaintiff alleges that it was left with a large excess of JP-4 fuel components over the remaining months of the contract. It is the alleged financial loss attributable to the unanticipated cutback which plaintiff seeks to recover in this action.

Plaintiff contends that the language of the contract, the conduct of the parties, and the commercial setting in which the contract was formed all confirm that defendant was contractually obligated to purchase from plaintiff the requirements for JP-4 jet fuel that existed during the contract term and that, given such an obligation, defendant plainly breached it. To plaintiff the breach occurred during the implementation of the cutback when defendant competitively evaluated both domestic and foreign suppliers on the basis of price alone; the inevitable result of that evaluation was that the reduction would fall entirely upon domestic rather than upon foreign refiners. Plaintiff adds, alternatively, that defendant also failed to live up to the high degree of good faith demanded of it when it failed to warn plaintiff at the outset that cutbacks would be carried out on the basis of price alone.

**9.** The result of that return to historical patterns was that U. S. Gulf Coast fuel would again cease to be used so extensively in the Pacific, and Caribbean fuel would again be used to meet anticipated needs in Europe and the continental United States.

In defense of this action, defendant contends that the contract language, defendant's need for flexibility, and the conduct of the parties require the conclusion that defendant's only obligation under that contract was to purchase from plaintiff a minimum of $100 worth of JP-4 jet fuel during the contract period; that under plaintiff's contract plaintiff was not to supply *all* the needs of any of the using activities listed in the IFB; and that when defendant's anticipated needs did not materialize, plaintiff was simply supplanted by lower-priced domestic suppliers who had been awarded contracts under the same bid items. In short, defendant contends that its contract with plaintiff was an indefinite quantity, open-end contract and that the only obligation it owed to plaintiff was to satisfy in good faith a minimum purchase requirement, which it did.

## II

A. We agree with the trial judge's reasoning that:

> * * * [b]ecause of the very nature of the procurement (and the product) involved, plaintiff's contract was clearly not such a "requirements" contract in any customary sense. See *Albano Cleaners, Inc. v. United States,* 455 F.2d 556, 197 Ct.Cl. 450 (1972); *Franklin Co. v. United States,* * * * [381 F.2d 416, 180 Ct.Cl. 666 (1967)]; *E. H. Sales, Inc. v. United States,* 340 F.2d 358, 169 Ct.Cl. 269 (1965); *Goldwasser v. United States,* 325 F.2d 722, 163 Ct.Cl. 450 (1963). [T.J. op. at 21–22.]

Plaintiff, either alone or in conjunction with others, did not have an absolute, unconditionally vested contract right to supply JP-4 jet fuel to meet the needs of any *particular* destination. Rather, the parties were cognizant that the procurement would result in a considerable number of separate, incremental contract awards to suppliers on a least-cost basis to defendant. While, in theory, each gallon of JP-4 jet fuel for which defendant awarded plaintiff a contract was, at the time of award, destined for a particular terminal, either within or without the United States, defendant's patent need for flexibility arising from ullage problems, changes in missions of using activities, increases or decreases in contemplated usage at particular using activities, availability of transportation, and changes in priorities of need meant that in actuality any fuel defendant purchased from anyone during the contract term might go anywhere.[10] These facts all point to an inevitable conclusion that plaintiff's contract with defendant was an indefinite quantity, open-end contract, not a requirements contract.

An indefinite quantity, open-end contract is used in a situation where the United States cannot estimate its needs except in terms of minimums and maximums;[11] whereas a requirements contract by definition contains an "estimated total quantity * * * obtained from the records of previous requirements and consumption * * * ."[12]

Plaintiff focuses on these definitions and argues that "the specificity of estimates set out in the subject contract comletely undercuts the idea that an indefinite quantities contract was contemplated"; plaintiff also

---

**10.** In fact, considerable amounts of plaintiff's origin delivery JP-4 fuel, theoretically designated for overseas use, were delivered to, *inter alia,* Alaska, Florida, Georgia, and South Carolina.

**11.** 32 C.F.R. § 3–409.3 (1975) describes indefinite quantity contracts, in pertinent part, as follows:

"3–409.3. *Indefinite Quantity Contracts.*

"(a) *Description.* This type of contract provides for the furnishing of an indefinite quantity, within stated limits, of specific supplies or services, during a specified contract period, with deliveries to be scheduled by the timely placement of orders upon the contractor by activities designated either specifically or by class. The contract shall provide that during the contract period the Government shall order a stated minimum quantity of the supplies or services and that the contractor shall furnish such stated minimum and, if and as ordered, any additional quantities not exceeding a stated maximum which should be as realistic as possible. The maximum may be obtained from the records of previous requirements and consumption, or by other means." * * *

**12.** 32 C.F.R. § 3–409.2(1975).

contends that the same conclusion was reached by this court in *E. H. Sales, Inc. v. United States*, 340 F.2d 358, 169 Ct.Cl. 269 (1965), and in *Goldwasser v. United States*, 325 F.2d 722, 163 Ct.Cl. 450 (1963). We do not agree with plaintiff's arguments.

The regulations which define an indefinite quantity contract provide that such a contract should state both a minimum quantity and a maximum quantity and that the maximum "should be as realistic as possible," and further, the regulations provide that "the maximum may be obtained from the records of previous requirements and consumption." We feel that the degree of specificity present in a few of the estimated maximum quantities in the IFB is owing to the precise knowledge of past consumption, not to the precise knowledge of future needs, and therefore provides no basis for determining whether the contract is a requirements or an indefinite quantity type contract. Moreover, the *E. H. Sales, Inc.* and *Goldwasser* cases lend no support to the plaintiff's position.

The contract involved in the *Sales* case listed 183 *particular* pieces of equipment, each specifically described by purpose, size, and manufacturer, which were to be repaired and overhauled by the contractor. Because only 38 of the listed machines were actually delivered for repair and overhaul, the contractor suffered an increase in unit costs and therefore initiated a claim for equitable adjustment under the "Changes" clause in the contract. The Government defended its action by claiming the contract was an indefinite quantity contract and that its obligations were restricted to the minimum dollar amount that had been set out in the "scope" clause of the contract. This court pointed out that there was nothing indefinite about the Government's requirements—at the time of contracting, the Government not only knew how many machines had to be repaired, but it was able to describe each particular machine in detail. We held that to construe that contract as an indefinite quantity contract would be wholly inconsistent with such specificity.[13]

In the instant case, we do not have the specificity that was involved in *Sales*. As previously mentioned, the Government, at the time of contracting for the JP-4 jet fuel, was not describing needs which had already arisen—it was estimating future needs based on past experience. The actual demand would depend upon the vagaries of weather, level of combat engagement, pace of general military operations, transfer of aircraft from one base to another, and loss of aircraft in battle; none of which could be accurately predicted at the time of contracting. Therefore, as we stated in *Sales*:

> This * * * [indefinite quantities] provision is applicable and entirely proper in a contract where the Government does not know what its requirements will be * * *.[14]

Likewise, the *Goldwasser* case does not lend support to the plaintiff's argument. The contract in *Goldwasser* called for the printing and delivery of a weekly newspaper over a 50-week period in sufficient quantities to supply each employee of the New York Naval Shipyard with a copy. The contract provided for a minimum number of copies per issue, with the Government reserving the right to add increments. When the contracting officer had terminated the contract, the contractor sued. The Government defended the action on the basis of the indefinite quantities clause and the termination for convenience clause.

Although the court rejected the Government's theory that the contract involved in *Goldwasser* was an indefinite quantity type contract, *Goldwasser* does not support Coastal State's argument in the instant case.

There are several crucial distinctions between *Goldwasser* and the instant action. First, in *Goldwasser* the deliveries were to be made weekly and at the fixed minimum quantity (equal to the number of employees at the shipyard) unless a larger quantity was ordered by the contracting officer.

---

13. 340 F.2d at 361, 169 Ct.Cl. at 274.

14. *Id.*

Since the quantities were not indefinite nor were deliveries to be made only at the call of the Government, the contract was not an indefinite quantity, call-type contract. In the instant case, however, deliveries were to be made only when the Government issued an order for them and the quantity was indefinite. Second, Goldwasser was awarded a contract to print all the newspaper copies that were needed at the New York Naval Shipyard during the contract period, whereas Coastal States was not given a contract to supply all the needs of any single using activity. We believe that these facts distinguish the instant action from *Goldwasser.* However, it should be mentioned that the court in *Goldwasser* did recognize the appropriateness of an indefinite quantity contract in a situation where the Government's need for a product or service is uncertain.

> * * * In such a situation, the indefinite-quantities clause fits the situation; it enables the Government to procure needed supplies but does not commit it to buy too much or at the wrong time.[15]

Nevertheless, plaintiff does not rest its arguments only on the detail with which projected needs were specified. In addition to that, plaintiff focuses on the conduct of the parties and on the express language in the solicitation and award documents, which plaintiff argues reinforce the conclusion that the United States negotiated a requirements type contract.

With relation to the conduct of the parties, plaintiff contends that the formal contract modification which the parties entered into on July 3, 1969,[16] is inconsistent with the idea that the parties were operating within the framework of an indefinite quantity contract. To support its contention, plaintiff refers the court once again to *Sales.*[17] Plaintiff argues that if the United States had understood the contract in issue to be one in which its sole obligation was to purchase no more than $100 worth of fuel, then the formalities of the contract amendment would have been an empty exercise.

We have analyzed the *Sales* case and find it inapposite to the instant case. The modification in *Sales* was contradictory to the indefinite quantity contract concept because it increased the obligations of the parties. The modification which Coastal States and the Government entered into on July 3, 1969, did not call for the sale of any additional product; it merely changed the place and method of delivery within the same service; it in no way altered the total maximum quantity which plaintiff was obligated to deliver, if ordered, or the minimum quantity which the Government was obligated to order. Consequently, we view the modification in this case as completely consistent with the contract between the parties being an indefinite quantity contract.

We have also examined the express language in the solicitation and award documents, upon which plaintiff relies to reinforce its conclusion that the United States negotiated a requirements type contract.[18] We feel, however, that plaintiff overlooked the fact that the language upon which it relies describes the contractor-seller's com-

---

**15.** 325 F.2d at 724, 163 Ct.Cl. at 455.

**16.** The modification is designated as Amendment/Modification No. P001.

**17.** 340 F.2d at 361, 169 Ct.Cl. at 274.

**18.** The opening paragraph of the schedule of estimates that formed part of the solicitation documents stated:
*SUPPLIES*
SUPPLIES TO BE FURNISHED (DFSC MAY 68)
(a) The supplies to be furnished hereunder, F.O.B. delivery points, methods of delivery and estimated quantities are as follows: [Immediately after the above-quoted language there fol-

lowed the specific breakdown of the award, in terms of items and gallons, that had been given to plaintiff.]
The plaintiff also focuses on language in the "Balance of Payments Restrictions" of the contract, which provides:
The following items being purchased hereunder are in implementation of the Balance of Payments Program. With regard to those items, the Contractor shall deliver only product which as been refined in the United States: [Following this paragraph is a per-item breakdown of the fuel that was awarded to Coastal States.]

mitment, not the Government-buyer's commitment. In other words, the language describes what the contractors, as sellers, must be ready to furnish, not what the Government, as buyer, must order. Accordingly, the language upon which plaintiff relies does not support its theory.

Under the circumstances of this case, we believe that the contract between the parties was an indefinite quantity, open-end contract; in fact, the only appropriate contract form was the indefinite quantity contract.[19] At the time of contracting, the Government's need for JP-4 jet fuel was uncertain. While it was obvious that the Government would need some JP-4 fuel over the course of the contract period, the Government had no idea how much it would need or where it would take delivery. In fact, the Government frequently found it necessary to take a shipment of JP-4 fuel ordered for one destination and reroute all or part of it to another, either because of ullage problems at the original destination or because of a more urgent need for it at an alternative destination.[20]

B. Since we interpret the contract as an indefinite quantity, open-end contract, we do not view the minimum obligation clause to be disharmonious with the contract as a whole.[21] However, we must address plaintiff's argument that the United States, in effecting the contract cutbacks, completely ignored the purchasing restrictions that it had initially imposed and upon which it had caused the contractor to rely.

Plaintiff points to two clauses in the solicitation: first, the Import Quota clause, wherein the DOD had stated that it "does not presently intend to utilize any of its 'finished products' import quota for purchases under this solicitation";[22] and second, the Balance of Payments Restrictions clause, wherein the DOD had stated that for certain designated requirements "[o]nly products which have been refined in the United States will be considered under this solicitation for such items."[23] Plaintiff states that on the basis of these two provisions, it concluded that the requirements itemized in the solicitation would involve competition only among domestic suppliers with each offering only domestic-refined fuel. These expectations did not materialize, plaintiff postulates, because of the lack of good faith dealing on the part of the United States when it ignored the IFB purchasing restrictions.

We are not sympathetic with plaintiff's position for two reasons: first, we do not believe that the Import Quota clause and the Balance of Payments Restrictions clause support the inference which plaintiff made; and second, we believe that plaintiff assumed the risk of not receiving a contract for all or part of the estimated quantities on which it bid when it bid prices so close to the cut-off point (i. e., the highest price defendant had to agree to pay for the jet fuel it ordered).

On the basis of the Import Quota and the Balance of Payment provisions, we do not believe that plaintiff could have reasonably concluded that it would be in competition

19. *See, Tennessee Soap Co. v. United States,* 126 F.Supp. 439, 130 Ct.Cl. 154 (1954).

20. It should be noted that such diversions, especially those made by reason of insufficient ullage at the original destination, would be contract breaches if the contracts awarded were interpreted to be requirements contracts. Namely, if the instant contract were interpreted to be a requirements contract, so must all the other contracts awarded pursuant to the solicitation be requirements contracts. In that event, if there was insufficient ullage at the original destination, then a diversion to another destination would be a breach of the requirements contract of the supplier who had the contract to supply the alternative destination.

21. Unlike *Albano Cleaners, Inc. v. United States,* 455 F.2d 556, 197 Ct.Cl. 450 (1972), the contract in this case did not contain a convenience-termination clause which applied to the entire contract; rather, the termination clause in the subject contract permitted termination only of orders actually placed with the supplier. Consequently, we find no provision in the subject contract which conflicts with the indefinite quantities clause.

22. Clause IE1, Import Quota (DFSC 1968 September).

23. Clause IE9, Balance of Payments Restrictions (DFSC 1968 September).

on the solicitation quantities with domestic suppliers only. The balance of payments provision applied only to 14 percent of the JP-4 fuel to be procured under the IFB; therefore, foreign-refined products could have been offered under the vast majority of the contract items. Consequently, plaintiff could not reasonably infer from the balance of payment provision that it would not be competing with foreign-refined fuel.[24] With respect to the Import Quota clause, that provision merely stated the *present* intent of the DOD. There was no promise on the part of the Government that it would not use the import quota during the life of the contract. Based on that statement, we do not believe that the plaintiff could reasonably infer that DOD would not at a later date utilize its import quota for purchases under the solicitation.[25]

With relation to plaintiff's bidding practices, plaintiff was well aware that a significant portion of the estimated quantity of JP-4 jet fuel to be procured under the instant solicitation was incremental to the normal needs of the Government and was due to the greatly increased demand caused by the military activity in Southeast Asia. Plaintiff also realized that when the military activity receded, the quantities of fuel needed would also decline. Therefore, to maximize its profits while the military campaign lasted, plaintiff bid prices that were very close to the cut-off point. Plaintiff's judgment was that contract awards pursuant to the solicitation would place an additional demand on domestic refineries without any corresponding, significant increase in domestic supply capability. In bidding prices so close to the cut-off point in order to maximize its profits, plaintiff necessarily

assumed the risk of misjudging the market and not receiving a contract for all or part of the estimated quantities on which it bid. When the Government learned that its actual demand for JP-4 jet fuel would be significantly lower than the original estimated quantities, the Government returned to its historical patterns of supply and returned to the channels of distribution existing prior to the instant solicitation. However, there is no evidence in the record of any foreign supplier, after the announced cutback, supplying the needs of any of the using activities identified for plaintiff's items which that foreign supplier was not already supplying before the cutback.[26] Moreover, there were other domestic suppliers who had contracts to supply the same using activities as did plaintiff. Therefore, plaintiff's assertion that it was cut back for no other reason than the fact that the product it was supplying was higher priced than foreign-refined fuel is incorrect. Plaintiff's fuel was also higher priced than that of almost all other domestic refiners.[27] We believe that is why plaintiff's estimated quantities were cut back so heavily. Had plaintiff bid lower prices, it could have been one of the 50 domestic refiners who were not cut back.

Although we find no evidence that the Government lacked good faith when it dealt with the plaintiff, we must, nevertheless, address plaintiff's charge.

Plaintiff cites *Gemsco, Inc. v. United States*[28] and argues that the Government did not spell out clearly enough all the information which was essential to plaintiff's decision to undertake the fuel contract in the first place. Not only do we not

24. There was no strict demarcation between the area supplied under the domestic IFB and the areas supplied under the offshore IFBs. Under IFB Item 365, plaintiff was in competition with the suppliers under the offshore IFBs, who were supplying Southeast Asia. Although the record does not explicitly indicate how much of plaintiff's contract involved an award under Item 365, it appears that the amount is approximately 100 million gallons.

25. *See, Air Terminal Services, Inc. v. United States*, 330 F.2d 974, 977–78, 165 Ct.Cl. 525,

532–33, *cert. denied*, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964).

26. Furthermore, there is no evidence in the record that the requirements which had been awarded to Coastal States remained after the cutback.

27. Plaintiff's prices were higher than 61 of the 65 non-exempt domestic refiners.

28. 115 Ct.Cl. 209 (1950).

subscribe to plaintiff's argument, we find *Gemsco* inapposite to the instant case.

In *Gemsco* a contractor had been awarded a contract in December 1943 to manufacture metal insignias for Naval uniforms. Notwithstanding that the Government knew that the contractor had begun to manufacture the insignias, the Government redesigned the insignia in April 1944, without notifying the contractor of the change in design. The contractor did not learn of the change until late June 1944, after already having manufactured a considerable quantity of the insignias. This court held that the contracting officer's failure to promptly notify the contractor of the design change was a breach of the "Changes" clause and a violation of the standard of good faith ordinarily required of the Government acting through its agents.

Unlike the *Gemsco* case, the Government here did not stand mute while plaintiff proceeded to perform the contract to its detriment for lack of information known only to the defendant. Plaintiff and the other contractors were informed of the anticipated reduction in JP-4 fuel usage within two days after the DFSC received the information. The DFSC then determined the effect of the reduction on each individual contractor by repeating the contract award evaluation process, this time using the reduced estimates of anticipated usage. The Government then advised the individual contractors of the result so as to permit them to make alternative uses of their refinery capacity. Accordingly we feel that the method by which this cutback was effected was logical, consistent with the purpose of the solicitation, and within the contractual rights of the Government. In other words, the Government acted in good faith—it apprised plaintiff of the new information as soon as possible and withheld no information from plaintiff.

NICHOLS, Judge, dissenting:

With all respect, I find myself unable to concur in the panel opinion, able as its analysis is in many respects.

The reader needs to know that (a) the trial judge did not adopt the plaintiff's contention that it had a requirements type contract obliging defendant to purchase from plaintiff its requirements for JP-4 jet fuel that existed during the contract term at the locations comprehended in the contract, and (b) the plaintiff has abandoned its original position, since before us it did not except to the trial judge's opinion and findings but rather, urged that we adopt them without change. In the absence of any quantum figures, it is impossible to say how much of a reduction in the claim this concession effected, but it has to be substantial. Defendant, to a large extent, prevailed before the trial judge, but it is unwilling to pay anything to settle for the losses it is alleged to have caused the plaintiff, and, therefore, it was the excepting party.

I would have adopted the opinion of the trial judge and his conclusion of law in toto. It struck me as an able and fair handling of a novel and sticky situation. His theory may be capsuled as follows. Defendant told plaintiff in the IFB that much of the fuel it supplied had to come from domestic refineries for balance of payment reasons. Moreover, defendant did not intend to make its import quota or any part thereof available. Plaintiff knew that large quantities of foreign made fuel would be obtained under other IFB's for offshore use, and would inevitably be cheaper. Obviously, therefore, the domestic, more costly fuel had some kind of special value to defendant since it did not put plaintiff in price competition with the offshore fuel in evaluating bids. Accordingly, in case of cutbacks, plaintiff might reasonably expect they would be applied on a theory consistent with the IFB's that in ordering the remaining quantities, its prices would be compared with those of other domestic suppliers at the same locations, and subject to the same cost-enhancing restrictions, but not with those of unrestricted suppliers of foreign fuel, thereby dissipating the balance of payment advantages defendant had made so much of in the IFB. This would have been rather obvious except for the $100 mini-

mum commitment which the court regards as all important but the trial judge, rightly I think, dismisses as standard boilerplate.

Under this theory, plaintiff would not recover anything for disproportionate reductions in procurement from it, whenever and to the extent that the remaining requirements were satisfied by other domestic suppliers working under similar restrictions who had bid lower prices.

The narrow literalism of the decision, and its insensitive insistence on deciding whether the contract was for an indefinite quantity or for requirements as established and mutually exclusive categories, will no doubt cause bidders to scrutinize IFB small print with more care, and insist that what they see as implied should be made express. Also, like so much else in Government contract law it says, in every bid you make, scrutinize your cost allowance for unforeseen contingencies. It is probably far too low.

I am attaching, to clarify my views, the trial judge's analysis of the positions of the parties and of his own intermediate position, which I would adopt.

WOOD, Trial Judge: * * *

In its main brief, plaintiff broadly contends that the language of plaintiff's contract, the conduct of the parties, and the commercial setting in which the contract was formed, all confirm that defendant was contractually obligated to purchase from plaintiff the requirements for JP-4 jet fuel that existed during the contract term *at the locations comprehended in the contract awarded to plaintiff,* and that, given such an obligation, defendant plainly breached it. Plaintiff adds, alternatively, that defendant also failed to "live up to the high degree of good faith demanded of it," with the same result.

In equally broad terms, defendant contends that the contract language, defendant's need for flexibility, and the conduct of the parties require the conclusion that defendant's only obligation under that contract was to purchase from plaintiff a minimum of $100 worth of JP-4 jet fuel during the contract period; that under plaintiff's contract plaintiff was not to supply *all* the needs of any of the using activities listed in the IFB; [15] and that when (as defendant

15. In its reply brief, plaintiff in effect concedes that it was not to supply all the needs of any particular destination listed in the IFB, but asserts that this is immaterial.

[The first 14 footnotes were in omitted portion.]

sees it) defendant's anticipated needs did not materialize, plaintiff was simply supplanted by "lower priced *domestic* suppliers" who had been "awarded contracts *under the same bid items.*" (Emphasis supplied.)

In its reply brief, plaintiff alters, and somewhat narrows, its principal line of argument, urging that defendant was contractually obligated to fill all the needs of all the destinations listed in the IFB by purchases of JP-4 jet fuel from plaintiff *and other domestic suppliers* awarded contracts pursuant to that IFB, and with domestically refined fuel, and that plaintiff had, but was denied, the right to supply such needs of the relevant destinations "as was appropriate under its contract" for the entire contract period.

There are inherent in plaintiff's broad position, or positions, ambiguities and undiscussed problems. For one thing, plaintiff largely ignores serious questions respecting plaintiff's right, *vis-a-vis* those other domestic suppliers awarded contracts pursuant to the IFB, to supply JP-4 jet fuel to defendant during the contract period. And, while plaintiff alludes to "appropriate adjustments between [domestic] suppliers," what that phrase means, in connection with this action, is not even hinted at.

Defendant's arguments present some very real difficulties as well. According to defendant, the "contract cutback" was effectuated simply by repetition, in reverse, of "the contract award evaluation process." Defendant asserts that this was logical, consistent with the purposes of the IFB, and within defendant's contract rights, and that

plaintiff's "real complaint" is that defendant "filled its needs as much as possible * * * from the lower priced *domestic* suppliers * * *." (Emphasis supplied.)

Defendant's view of the case overlooks indisputable facts: that, in the implementation of the cutback necessitated by defendant's having under contract some 399,000,-000 gallons of JP-4 jet fuel in excess of needs, defendant competitively evaluated both domestic and foreign suppliers *on the basis of price alone;* that, given the circumstances of this case, the inevitable result of that evaluation was that the reduction would fall entirely upon domestic rather than upon foreign refiners;[16] and that,

16. Plaintiff, and 14 other United States firms, were cut back a total of 397,000,000 gallons, while no foreign supplier was cut back at all.

during the period here relevant, foreign-refined JP-4 jet fuel under contract to defendant pursuant to the offshore IFBs was delivered to the Pacific and to Europe (with consequent impact on the applicable Balance of Payments Program), and, by use of DOD's foreign-refined products import quota, imported into the United States, in lieu of domestically refined JP-4 jet fuel also under contract to defendant as a result of the IFB.

Moreover, the respective arguments of the parties, by their joint failure to recognize either the unitary nature of the IFB and the offshore IFBs, and the multiple contracts defendant awarded to domestic and foreign suppliers as a result of those IFBs, or the significance of the circumstances surrounding the procurements, tend to obscure rather than illuminate.[17] In

17. Because of the nature of the several procurements here relevant, the nature of the product involved, and the worldwide scope of those procurements, fitting the case neatly within a requirements, or indefinite quantities, contract mold, as the parties' main briefs do, could be done, if at all, only by considerable forcing.

light of the foregoing, the reaching of proper conclusions respecting the rights and obligations created by the contract is far from easy.

In reaching any such conclusions, however, it is appropriate to "look both to the written terms and to the surrounding circumstances, availing ourselves 'of the same light which the parties possessed when the contract was made.'" *Franklin Co. v. United States,* 381 F.2d 416, 418, 180 Ct.Cl. 666, 669 (1967); see also *ITT Arctic Services, Inc. v. United States,* 524 F.2d 680, 683–84, 688, 207 Ct.Cl. 743, 751–52, 759 (1975). In this sort of situation, as in others, "courts have never completely shut their eyes to evidence of the parties' shared understanding drawn from the transaction's milieu or working-out." *Franklin Co. v. United States, supra,* 381 F.2d at 418, 180 Ct.Cl. at 669. Where, as here, the contractual provisions are indeed anemic, scrutiny of the transaction's surrounding circumstances is not only peculiarly appropriate, but essential.

Defendant's worldwide pattern for procurement of JP-4 jet fuel for the period July 1 to December 31, 1969, serves as a proper and useful starting point for purposes of analyzing the nature of plaintiff's contract, and the mutual rights and obligations thereby created. For that contract term, defendant issued a total of six solicitations for JP-4 jet fuel.

One, the IFB, covered defendant's estimated needs for such fuel during the contract period at more than 300 specified, and separate, using activities (by location) in the United States, Europe, and the Pacific. The "offshore" portion of the IFB was specifically made subject to balance of payments restrictions, with only domestically refined fuel to be acceptable to defendant thereunder. Moreover, the practical meaning and effect of DFSC's explicit renunciation of use of DOD's foreign-refined products import quota in the IFB was that the *domestic* portion of the procurement (representing some 86 percent of the total gallonage of JP–4 jet fuel covered by the IFB) would also be domestically refined fuel, and the parties necessarily so understood.

As a result of the remaining five "offshore" IFBs, defendant contracted to pur-

chase from foreign refiners fuel (not subject to balance of payments restrictions and not domestically refined) which was, by definition, cheaper than domestically refined fuel, for delivery to various specified, and largely if not entirely different, overseas locations.

The IFB itself resulted, and the parties were necessarily cognizant that it would result, in a considerable number of separate, incremental contract awards to domestic suppliers, on a least-cost basis to defendant. While, in theory, each gallon of JP-4 jet fuel for which defendant awarded plaintiff a contract was, at the moment of award, destined for a particular terminal, either within or without the United States, defendant's patent need for flexibility, arising from ullage problems, changes in missions of using activities, increases or decreases in contemplated usage at particular using activities, availability of transportation, and changes in priorities of need, meant that in actuality any fuel defendant purchased from anyone during the contract term *might* go anywhere, and that too must have been in the minds of the parties.[18]

18. In fact, considerable amounts of plaintiff's origin delivery JP-4 jet fuel, theoretically designated for overseas use, were delivered to, *inter alia,* Alaska, Florida, Georgia, and South Carolina.

In these circumstances, the notion that plaintiff, either alone or in conjunction with others, had an absolute, unconditionally vested contract right to supply JP-4 jet fuel to meet the needs of any *particular* destination simply ignores reality. Because of the very nature of the procurement (and the product) involved, plaintiff's contract was clearly not such a "requirements" contract, in any customary sense. See *Albano Cleaners, Inc. v. United States,* 455 F.2d 556, 197 Ct.Cl. 450 (1972); *Franklin Co. v. United States, supra; E. H. Sales, Inc. v. United States,* 340 F.2d 358, 169 Ct.Cl. 269 (1965); *Goldwasser v. United States,* 325 F.2d 722, 163 Ct.Cl. 450 (1963).

When plaintiff's contract is scrutinized in light of its terms and defendant's pattern of procurement under the IFB, however, it is equally clear that the boilerplate "Scope of Contract" clause on which defendant relies in asserting that its maximum *obligation* to plaintiff was only to purchase $100 worth of JP-4 jet fuel during the contract term, may not properly be so construed. See *ITT Arctic Services, Inc. v. United States, supra; Contra Costa County Flood Control and Water Conservation District v. United States,* 512 F.2d 1094, 206 Ct.Cl. 413 (1975); *Corbino v. United States,* 208 Ct.Cl. 1002, 1006 (1976). As this court said in *Albano Cleaners, Inc. v. United States, supra,* 455 F.2d at 561, 197 Ct.Cl. at 459:

 * * * Whatever the permissible scope of such an indefinite quantities provision is * * *, such an unusual and unfair interpretation of the clause here involved as defendant proposes could hardly have been in accord with 'the rational intention of the parties' when they entered into this contract, * * * and the court would not be justified in adopting it. [Citations omitted.]

One relevant consideration is that at least some crude oils essential to the production of JP-4 jet fuel must be contracted for on an advance basis (and in some cases 6 to 12 months ahead of scheduled production time); such crude oils acquired for JP-4 jet fuel production can be used to make other salable end products (and JP-4 jet fuel use in the United States is limited exclusively to military applications, with no private or commercial demand), but only if the purchaser's refinery has sufficient, specialized facilities to do so. In 1969, plaintiff did not have sufficient facilities so to process the feed stocks which would be produced from its crude oil purchases made with a view to producing JP-4 jet fuel for defendant. These factors militate strongly against a holding that, while plaintiff was contractually committed to supply to defendant some 1,000,000 gallons of JP-4 jet fuel per day over a 6-month period, defendant's obligation to plaintiff was only to order $100 worth of such fuel during that same

period.[19] *Cf., ITT Artic Services, Inc. v. United States, supra; Albano Cleaners, Inc. v. United States, supra; Franklin Co. v. United States, supra; Goldwasser v. United States, supra.*

19. Plaintiff's contract explicitly stated that each pipeline or tanker delivery would be, minimally, 840,000 gallons. While it is unnecessary so to hold, this provision would be difficult to construe as consistent with defendant's view of the Scope of Contract clause.

That aside, however, the IFB's (and the contract's) terms, construed in light of the contractual history and background, point in that same direction. As the court has held in similar circumstances, there was "a shared understanding infused into the anemic words of the contract * * * " *Franklin v. United States, supra,* 381 F.2d at 420, 180 Ct.Cl. at 673.

Defendant did not advise plaintiff and the other successful domestic bidders pursuant to the IFB that any specific needs would exist at any particular destination, or at all of them (for the IFB dealt in estimated quantities only, and in plaintiff's prior dealings with defendant underlifts of JP-4 jet fuel of an average magnitude of 10 to 15 percent of contract quantities had been experienced), nor did it say even that a successful domestic bidder, alone or with others, would have the right to supply the actual needs of any particular destination. The IFB did indicate clearly, however, that to the extent defendant did have needs at all the destinations covered by the IFB, those needs would (except in extraordinary circumstances) be filled pursuant to the IFB, and with domestically refined fuel. In turn, defendant also indicated as clearly that, in substance, it had, and would exercise, the right to fill those particular needs by orderings on the same basis on which contract awards *pursuant to the IFB* would be made in the first place, *i. e.,* at the least possible cost to defendant.

In short, in the circumstances of this case, plaintiff's contract, construed in the light cast by its history and background, gave plaintiff, in general terms, a right to compete with those other *domestic* suppliers

awarded contracts pursuant to the IFB, for whatever requirements for JP-4 jet fuel defendant did have during the contract term at the several destinations covered by the IFB.[20]

20. Parenthetically, this construction is confirmed by contract modifications between the parties, both before and after implementation of the cutback, decreasing quantities of items awarded to plaintiff, and adding new items. See *E. H. Sales, Inc. v. United States,* 340 F.2d 358, 169 Ct.Cl. 269 (1965).

The foregoing does not say, and should not be understood to mean, that under no circumstances could defendant receive fuel ordered under the offshore IFBs at the destinations covered by the IFB. An absolute necessity for diversion of ordered foreign fuel because of ullage problems at a destination covered by the offshore IFBs, because of military necessity, or other good and sufficient reason for delivery of such ordered foreign fuel to a destination covered by the IFB, must have been within the contemplation of the parties when they entered into the contract in suit. Thus, to any extent defendant's requirements at the destinations covered by the IFB may have been validly reduced, no breach resulted.

To the extent, however, that defendant purchased JP-4 jet fuel from foreign refiners under contract to it pursuant to the offshore IFBs to satisfy the needs of the various destinations covered by the IFB *on the basis of price alone,* a breach of contract occurred. That action was neither so contemplated nor within defendant's contractual rights. And, while the present record is quite vague as to precisely how defendant met its JP-4 jet fuel needs worldwide during the second half of 1969, the facts surrounding the cutback hereinabove set forth abundantly demonstrate that just such a breach did occur, to plaintiff's detriment. Accordingly, plaintiff is entitled to recover *to the extent it has been damaged by that breach.* Determination of the amount of such recovery is reserved for further proceedings pursuant to Rule 131(c).

It must be added, however, that to the extent defendant had under contract *domestically* refined JP-4 jet fuel in excess of needs at the several destinations covered by the IFB, defendant was well within its contractual rights in declining to order such fuel from plaintiff, if it could instead order such fuel for those several destinations covered by the IFB from "lower priced domestic suppliers" who, with plaintiff, had been awarded contracts pursuant to the IFB.

All of the contracts to supply defendant's estimated needs at the various locations specified in the IFB were awarded as a result of competitive bidding, and on a least-cost basis to defendant. If an excess of domestically refined fuel under contract for such destinations over actual needs at those destinations materialized, defendant was well within its contractual rights in ordering the domestically refined fuel available to it to meet such actual needs (and no more) at the least possible cost.

To the extent, if any, plaintiff here complains that its contract quantities were cut back in consequence of the exercise by defendant of that right, plaintiff is not entitled to recover. On the present record, the effect of that conclusion on the parties cannot really be determined. Since, however, further proceedings to determine the amount of plaintiff's recovery are in any event required, that issue can also be explored in such proceedings.

One final matter requires brief note. On July 23, 1970, long after the implementation of the cutback, but prior to the commencement of suit in this court, plaintiff sought a contract amendment without consideration, pursuant to Public Law 85–804, 72 Stat. 972, 50 U.S.C. §§ 1431–1435. In making that request, plaintiff stated, *inter alia,* that the contract in suit was of the type "referred to as an indefinite quantity contract," and that defendant's actions thereunder were "within its literal rights under this unusual type of contract * * *." Defendant seizes upon these statements as, in effect, a concession by plaintiff that it has no right to recover herein.

As plaintiff properly points out, the statements are, at best, ambiguous and amorphous. They were, moreover, made not prior to the onset of controversy between the parties, as defendant suggests, but as part of a post-controversy endeavor to obtain equitable relief. In all the circumstances, they deserve, and are given, no weight in determining the rights of the parties to this litigation.

### CONCLUSION OF LAW

For the foregoing reasons, we find that the contract between Coastal States and the United States is an indefinite quantities, open-end contract; we also find that the United States has in good faith met all obligations which it had to plaintiff under the contract. Accordingly, the trial judge's findings of fact, opinion, and recommended conclusion of law are modified to accord with the facts and law hereinbefore set forth. Since the court concludes that the defendant is not liable to the plaintiff, the petition is dismissed.